# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
August 4, 2010

No. 09-30722

Lyle W. Cayce
Clerk

STEWART ENTERPRISES, INC.; S. E. CEMETERIES OF LOUISIANA, INC.; S. E. FUNERAL HOMES OF LOUISIANA, INC.; S. E. SOUTH-CENTRAL, INC.; LAKE LAWN PARK, INC.; LAKE LAWN METAIRIE FUNERAL HOME, individually and as a joint venture between Stewart Enterprises, Inc., and S.E. Funeral Homes of Louisiana, Inc.; STEWART RESOURCE CENTER, INC.; STEWART SERVICES, INC.; ACME MAUSOLEUM CORP.,

Plaintiffs - Appellants Cross-Appellees

v.

RSUI INDEMNITY COMPANY, INC.,

Defendant - Appellee Cross-Appellant

Appeals from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, DAVIS, and BENAVIDES, Circuit Judges.

PER CURIAM:

This appeal presents a familiar dispute in the aftermath of Hurricane Katrina. Stewart Enterprises, owner of cemeteries, funeral homes and other commercial properties throughout New Orleans, brought this action against its excess insurer, RSUI, to recover for wind and flood damage sustained during the storm. The parties dispute whether RSUI's excess liability policy covers damage

No.09-30722

caused by flood, and if so, under what conditions. The district court found the policy covered flood, but that the coverage was limited by the policy's anti-concurrent causation clause. Neither party satisfied, both appealed. We find in favor of coverage and remand for further proceedings.

I

Prior to Katrina, Stewart insured its properties and businesses with three layers of insurance. The primary layer, issued by Lexington Insurance Company, provided all risk coverage up to $10 million, including $10 million in flood coverage. The first excess layer, issued by Lloyd's, London, provided $15 million of all risk coverage, also including $15 million in flood coverage, excess to the first $10 million provided by Lexington. Stewart's second excess layer, issued by RSUI, provided a coverage limit of $225 million, excess to the $25 million provided by the first two layers. Both the Lloyd's and RSUI policy contained "following form" clauses adopting the terms and conditions of the Lexington primary policy.

During and directly after the storm, Stewart's properties suffered heavy damage from wind and flood. As was generally the case after Katrina, it was not easily determinable what portions of the damage were caused by wind, flood, or some combination of the two. This difficulty has proven to be a significant roadblock for many of the victims attempting to recover compensation from their insurance carriers, of which Stewart is only the latest.

After Katrina, Stewart sought to recover from all three insurers for damage caused by wind and flood. Both Lexington and Lloyd's paid the full balance of their policies, but unfortunately, RSUI and Stewart have been unable

No.09-30722

to resolve Stewart's claims. Central to their dispute is whether the RSUI policy covers damage caused in whole or in part by flood. RSUI contends that the policy plainly excludes liability for all flood damage and that to the extent the policy covers any flood damage, it is limited by the anti-concurrent causation clause (ACC clause) to damage caused exclusively by flood and not in conjunction with another peril, such as wind. Stewart disagrees, claiming the RSUI policy adopts the limits set forth in the Lexington and Lloyd's policies, covering any of the $25 million in flood coverage unpaid by Lexington and Lloyd's, and that the ACC clause only operates above that $25 million limit.

Both parties moved for summary judgment before the district court and the district court denied both motions. The district court first found that the RSUI policy covered up to $25 million in flood damage, subject to reduction based on payments for flood damage by either Lexington or Lloyd's. The district court then found that the ACC clause barred any recovery for damage jointly caused by wind and flood, although the policy permitted recovery for damage caused by wind or flood exclusively (up to the $25 million limit for flood damage). After the district court certified the issues, both parties filed interlocutory appeals. We review de novo.[1]

II

Both parties agree that Louisiana law governs the interpretation of the policy.[2] "Under Louisiana law, an insurance policy is a contract between the parties and should be interpreted according to the general rules of interpretation

---

[1] *Nunez v. Allstate Ins. Co.*, 604 F.3d 840, 844 (5th Cir. 2010).

[2] *See In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 206 (5th Cir. 2007).

No.09-30722

of contracts prescribed in the Louisiana Civil Code."[3] In interpreting the insurance policy, when the words of the policy are clear, and do not lead to absurd consequences, "no further interpretation may be made in search of the parties' intent."[4] The policy's provisions "must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." Where provisions are ambiguous, they are "are generally construed against the insurer and in favor of coverage"[5] although "a court may look to parol evidence to determine the parties' intent."[6] We turn now to the policies.

A.

RSUI contends the district court erred in finding the policy provides up to $25 million in flood damage and argues the policy only provides coverage for damage from wind and other perils. The RSUI policy is an excess layer insurance policy with a "following form" provision. This provision states that the RSUI policy is "subject to the same warranties, terms and conditions . . . as are contained in or as may be added to" the primary insurance policy—here the Lexington policy. We start from the ground up, first examining the terms of the Lexington policy and then looking to the RSUI policy overlay.

---

[3] *Nunez*, 604 F.3d at 844-45.

[4] La. Civ. Code art. 2046.

[5] *Cadwallader*, 848 So.2d at 579 (citing La. Civ. Code art. 2056).

[6] *American Elec. Power Co. Inc. v Affiliated FM Ins. Co.*, 556 F.3d 282, 286 (5th Cir. 2009).

No.09-30722

The Lexington policy provides $10 million in all risk coverage subject to several exclusions and sublimits.[7]  The policy is roundabout in its construction:  Sections 2 and 9 set general coverage at $10 million per occurrence for all risks, subject to the exclusions contained in section 10.  Section 10(P)(2) excludes all

---

[7] The relevant provisions of the Lexington Policy read in full:
MANUSCRIPT ALL RISK FORM

. . .
2.    LIMITS OF LIABILITY

The company insures up to and shall not be liable for more than $10,000,000 per occurrence.

3.    SUBLIMITS OF LIABILITY
. . .
    J.    $10,000,000    In aggregate for any one policy year for the peril of flood.

. . .
9.    PERILS INSURED AGAINST

This policy insures against all risks of direct physical loss of or damage to property described herein including general average, salvage and all other similar charges on shipments covered hereunder, if any, except as hereinafter excluded.

10.    PERILS EXCLUDED

This policy does not insure against loss or damage caused directly or indirectly by any of the excluded perils.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:
. . .
P.    loss or damage caused by or resulting from:
. . .
    (2)    Flood, unless specified in Section 3, Sublimits of Liability, Paragraph J., and then only for such specified amount;

    (3)    any and all loss from any other cause when occurring concurrently or sequentially with Earthquake, Volcanic Eruption or Flood, except Fire; . . .

No.09-30722

"loss or damage caused by or resulting from: . . . Flood unless specified in Section 3, Sublimits of Liability, Paragraph J., and then only for such specified amount." Section 3(J) provides a sublimit of $10 million aggregate for flood per policy year. Taking the provisions together, the policy provides for $10 million per occurrence for all risks, except in the case of flood, where the policy only provides $10 million aggregate per year.

No.09-30722

The RSUI policy provides coverage excess to the Lexington policy.[8]  The

_____

[8] The RSUI policy reads in relevant part:

EXCESS PHYSICAL DAMAGE FORM
. . .
2.    APPLICATION OF UNDERLYING PROVISIONS:

In respect of the perils hereby insured against this Policy is subject to the same warranties, terms and conditions (except as regards the premium, the amount and limits of Liability other than the deductible or self-insurance provision where applicable, and the renewal agreement, if any, AND EXCEPT AS OTHERWISE PROVIDED HEREIN) as are contained in or as may be added to the Policy(ies) of the Primary Insurer(s) prior to the happening of a loss for which claim is made hereunder and should any alteration be made in the premium for the Policy(ies) of the Primary Insurer(s), then the premium hereon may be adjusted accordingly.

3.    LIMIT:

Provided always that liability attaches to the insurer(s) only after the Primary and Underlying Excess Insurer(s) have paid or have admitted liability for the full amount of their respective liability as set forth in Item 8 of the Schedule and designated "Primary and Underlying Excess Limit(s)" and then the limits of the Insurer(s) Liability shall be those set forth in Item 8 of the Schedule under the designation "Excess Limit(s)" and the Insurer(s) shall be liable to pay up to the full amount of such "Excess Limit(s)".

4.    MAINTENANCE OF PRIMARY AND UNDERLYING POLICY/IES AND LIMITS:

It is a condition precedent to recovery under this Policy that the Policy(ies) and Limit(s) of the Primary and Underlying Excess Insurer(s) set forth in Item 8 of the Schedule be maintained in full force and effect, except for any reduction or exhaustion of any underlying aggregate Limits of Liability contained therein, solely by the amount of loss(es) paid or admitted during the policy year.

There is no recovery under this excess policy as respects those coverages with are sublimited within the primary and/or underlying excess policy(ies) to amount less than the amount indicated in item 8 of the Schedule, however, the Insurer(s) to this excess policy recognize that the primary and underlying excess policy limits can be eroded or exhausted, wholly or partially, by application of said sublimits.

In the event of such reduction of the aggregate Limits of Liability of the Primary and Underlying Excess Insurance's this Policy shall pay excess over the reduced aggregates limit. In the event of exhaustion of aggregate Limits of Liability of the Primary and Underlying Excess Insurances this Policy, subject to all its provisions, shall continue in force as Primary

No.09-30722

policy contains in section 2 a "following form" provision which states that the

---

Insurance in respect of the peril for which the aggregate Limit of Liability has been so exhausted and the deductible or self-insured amount applicable to that peril as set forth in Item 8 of the Schedule, shall apply to this Policy.

. . .

THE SCHEDULE

. . .

4.    Perils Insured:    As defined in the Primary policy issued by Lexington Insurance Co., policy number 8753559.

. . .

8.    (a) Primary Limit(s)

| COVERAGE LAYER | TOTAL LIMIT OF LIABILITY FOR PRIMARY INSURER | INSURER | POLICY NO. | LIMIT/ PARTICIPATION |
|---|---|---|---|---|
| I. | $10,000,000 | LEXINGTON INS. CO. | 8753559 | $10,000,000 (100%) |

(b) Underlying Excess Limit(s):

| COVERAGE LAYER | TOTAL LIMIT OF LIABILITY FOR PRIMARY INSURER | INSURER | POLICY NO. | LIMIT/ PARTICIPATION |
|---|---|---|---|---|
| II. | $15,000,000 XS $10,000,000 | Underwriters @ Lloyds | BO66422340A04 | $15,000,000 (100%) |
| III. | $225,000,000 XS $25,000,000 | RSUI Indemnity Co. | NHD338080 | $225,000,000 (%100) |

9.    Total Limits [including "Primary" and "Underlying Excess"] subject to annual aggregates [per layers and participation's as outlined in item 8 above]:

$25,000,000 any one policy year in respect of the peril of Flood
$25,000,000 any one policy year in respect of the peril of Earthquake

policy "is subject to the same warranties, terms and conditions (except as regards the premium, the amount and limits of Liability other than the deductible or self-insurance provision where applicable, and the renewal agreement, if any, AND EXCEPT AS OTHERWISE PROVIDED HEREIN)" as the Lexington primary policy. Under section 3, RSUI's liability is only triggered once Lexington and Lloyd's pay the limits of their policy as set forth in Item 8 of the schedule.

The policy's coverage limits are set forth in the attached Schedule. Item 4 sets forth the perils insured, again by reference to the Lexington policy, stating, "Perils Insured:  As defined in the Primary policy issued by Lexington Insurance Co." Item 8 sets forth the primary and underlying general policy limits, $10 and $15 million respectively, which under section 3 of the RSUI policy must be paid before triggering RSUI's liability. The only mention of flood insurance comes in Item 9: "Total Limits [including "Primary" and "Underlying Excess"] subject to annual aggregates [per layers and participation's as outlined in item 8 above]: $25,000,000 any one policy year in respect of the peril of Flood; $25,000,000 any one policy year in respect of the peril of Earthquake."

Additional complication is created by the Lloyd's policy, which sits as the primary excess insurance layer between the Lexington and RSUI policies,[9] and

_____

[9] The Lloyd's policy reads in relevant part:
EXCESS PHYSICAL DAMAGE FORM
. . .
2.    APPLICATION OF UNDERLYING PROVISIONS

In respect of the perils hereby insured against this Policy is subject to the same warranties, terms and conditions (except as regards the premium, the amount and limits of Liability other than the deductible or self-insurance provision where applicable, and the renewal agreement, if any, AND EXCEPT AS OTHERWISE PROVIDED HEREIN) as are contained in or as may be added to the Policy(ies) of the Primary Insurer(s) prior to the happening of a loss for which

No.09-30722

contains an identical "following form" provision keyed to the Lexington primary policy. Unlike the RSUI policy, the Lloyd's policy specifically provides for excess flood coverage, supplying an additional $15 million of flood coverage excess to the $10 million provided by the Lexington policy. The Lloyd's policy also differs from the RSUI policy in including under Item 4 of its Schedule, Perils Insured, "All risks of Direct Physical Loss or Damage including Flood and Earthquake excluding Boiler and Machinery as per Primary Policy."

---

claim is made hereunder and should any alteration be made in the premium for the Policy(ies) of the Primary Insurer(s), then the premium hereon may be adjusted accordingly.

. . .

SCHEDULE

. . .

4.   Perils Insured:   All risks of Direct Physical Loss or Damage including Flood and Earthquake excluding Boiler and Machinery as per Primary Policy.

. . .

8.   (a) Primary Limit(s)

| COVERAGE LAYER | TOTAL LIMIT OF LIABILITY FOR PRIMARY INSURER | INSURER | Participation | Policy No. |
| --- | --- | --- | --- | --- |
| I. | $10,000,000 | LEXINGTON INS. CO. | 100% | 8753559 |

. . .

9.   Primary and Underlying Excess Limit(s)
USD 10,000,000 Ultimate net loss per occurrence subject to an aggregate limit of
USD 10,000,000 any one Policy year in respect of the peril of Flood, and
USD 10,000,000 any one Policy year in respect of the peril of Earthquake
Which in turn excess of Underlying deductibles

10.  Excess Limit(s)
USD 15,000,000 Ultimate net loss per occurrence subject to an aggregate limit of
USD 15,000,000 any one Policy year in respect of the peril of Flood, and
USD 15,000,000 any one Policy year in respect of the peril of Earthquake
Which in turn excess of Underlying deductibles

No.09-30722

The Lexington and Lloyd's policies each have two relevant limits, the total limit per occurrence and the flood aggregate limit. As the insurers did not specify what, if any, portion of their payments were for flood damage, there is a possibility that although the total limits were reached, the flood limits were not. Stewart urges that in this scenario the RSUI policy steps in to cover the unpaid aggregate limit once the total limits of the underlying policy are reached. The district court agreed with Stewart, focusing on the language contained within Items 4 and 9 of the RSUI Schedule and finding the reference back to the Lexington policy and the recitation of the annual aggregate limit of $25 million for flood damage afforded coverage under the RSUI policy.

We begin with Item 4 of the RSUI policy which defines perils insured by reference to the Lexington policy. Under the Lexington policy, flood is excluded from coverage, with the exception of a $10 million sublimit, such that up to $10 million in damage, flood is treated as an included peril. It is unclear whether the parties intended to incorporate this exception to the exclusion. The resolution turns in part on the scope of the following form provision. The following form provision states "this Policy is subject to the same warranties, terms and conditions (except as regards to the premium, the amount and Limits of Liability other than the deductible . . .) as are contained in" the primary policy—notably excluding the "Limits of Liability" from its incorporation. As the flood exception is arguably a "limit of liability," section 2 suggests it is not incorporated. But Item 4 provides an independent reference to the Lexington policy and it is unclear whether it is governed by section 2's limitation. We are thus faced with an ambiguity: Whether Item 4 incorporates the Lexington policy's coverage of flood damage, or whether, because the flood coverage is a

11

sublimit exception to the flood exclusion, Item 4 only incorporates the flood exclusion itself.[10]

Looking to the remainder of the RSUI policy and schedule only further muddies the water. Items 8 and 9 of the RSUI Schedule provide a summary of the policy limits provided by the various layers of coverage. Item 8 sets forth the overall policy limits contained within each of the layers. Item 9 sets forth two sublimits with aggregate yearly limits, flood and earthquake, distinguishing them from perils covered on a per occurrence basis. RSUI contends this is the sole purpose of Item 9, to highlight the fact that Stewart's coverage in the underlying policies for flood and earthquake are limited to an aggregate yearly amount and that Item 9 does not suggest that RSUI itself is liable for the $25 million in flood coverage. RSUI points to the language "[including 'Primary' and 'Underlying Excess']" as limiting that provision to summarizing the coverage provided by the underlying policies. But the word "including" does not exclude RSUI—the language instead suggests that the total limit subject to annual aggregate for flood is $25 million to be provided by Lexington, Lloyd's, and RSUI

_____

[10] RSUI points to the Lloyd's policy which contains an identical following form provision. Unlike the RSUI policy's Schedule, the Lloyd's Schedule adds an additional $15 million in excess coverage for flood damage. RSUI reasons that if the RSUI and Lloyd's provisions are both to be read as to provide liability for the Lexington policy's $10 million sublimit, it would lead to inconsistencies within the Lloyd's policy indicating that the following form provision was not intended to incorporate the sublimit in the Lexington policy. But this argument does not bear on whether under the Lexington policy flood damage is defined as a covered peril such that the RSUI policy also treats flood as a covered peril.

Likewise, we reject RSUI's claim that, if liable for flood at all, it should only be liable for the initial $10 million sublimit under the Lexington policy, noting that nothing in the RSUI policy incorporates any provision of the Lloyd's policy. Item 4 defines perils insured and incorporates the Lexington policy's coverage of flood, but the amount of coverage is derived from the remainder of the policy.

No. 09-30722

together. Read in conjunction with Item 4, the policy seems to provide coverage for $25 million of flood damage, aggregate per year, between the three insurers.[11]

Under Louisiana law, ambiguities in the policy are to be interpreted in favor of the insured. Governed by this blackletter interpretive rule, we find the policy provides flood coverage. Of course, had RSUI wished to deny coverage for flood damage within the Lexington and Lloyd's aggregate limits, it could have done so, but the court will not engage in interpretive gymnastics to favor the party that drafted the contract.

Reading the RSUI policy to cover flood within the $25 million aggregate limit also makes practical sense. Neither Lexington nor Lloyd's expressly allocated any portion of its payments between wind and flood. Under RSUI's reading, Stewart's total recovery could depend on arbitrary accounting decisions by Lexington and Lloyd's. For instance, suppose Stewart suffered $30 million in flood damage and $70 million in wind damage. The total payout by Lexington and Lloyd's will never exceed $25 million, and it matters not to them for what they are paying: $25 million is $25 million. But under RSUI's reading it would matter to Stewart a great deal. Were the court to find Lexington and Lloyd's allotted all $25 million to flood damage, Stewart could recover the full $70

---

[11] RSUI points to section 10 of its policy, contending that it too bars flood coverage. The provision reads:

> For the purpose of attachment of coverage for excess layers, it is further agreed that loss involving any interest and/or peril covered in any primary or underlying excess layers, but excluded in higher excess layers, shall be recognized by such excess layers as eroding or exhausting the occurrence limits of the primary and/or underlying excess layer(s). Nothing herein, however, shall be deemed to extend coverage in such layer(s) to include loss from the specifically excluded peril in the excess layer itself.

This language only begs the question of which perils are excluded in the excess layer and adds nothing to our analysis.

No.09-30722

million from RSUI, for a total collection of $95 million (of $100 million in damage suffered). On the other hand, if Lexington and Lloyd's allotted all $25 million to wind damage, RSUI would only have to pay $45 million—the remaining amount liability for wind damage—leaving Stewart to collect a total of only $70 million and nothing for the damage by flood. In contrast under Stewart's reading, Stewart receives the same amount regardless of how Lexington and Lloyd's characterize their payments—Stewart will be able to recover a total of $25 million in flood and $70 million in wind. While it would be foolish to rest an interpretation of an insurance contract on its practical sensibility, we take comfort that our reading reduces the chance that the amount of the insured's recovery will be arbitrary.

Lastly, RSUI argues that parol evidence indicates the parties did not intend the RSUI policy to cover any flood damage. Parol evidence should only be used to determine the intentions of the parties at the time the contract was made, not after the fact.[12] RSUI provides as evidence a confirmation of coverage made directly after the signing of the insurance agreement.[13] The confirmation of coverage includes the language, "Perils Covered: All Risk of Direct Physical Damage or Loss excluding Flood, Earthquake and Boiler and Machinery." We find this short summary statement to be insufficient to resolve any ambiguity in the policies in favor of the insurer. The statement may be read as simply

---

[12] *See Miller v. Miller*, 1 So.3d 815, 818 (La. App. 2d Cir. 2009).

[13] RSUI also provides emails written in December, 2005, after Katrina and after Stewart began looking to recover—these are not probative of the parties' intent at the time of contracting. Moreover, the emails do not actually speak to the question. Rather they merely restate what is already accepted, that Stewart has a policy limit of $25 million for flood without addressing whether RSUI is liable for any part of that $25 million left unpaid by the underlying insurers.

## No.09-30722

restating the fact that no flood coverage is provided above the $25 million set forth in the underlying policies—i.e., that the policy provides no additional flood coverage. Without more, we find this evidence to be insufficient to clarify the policy's ambiguity.

### B.

Finding flood coverage, we now turn to whether the ACC clause bars recovery for damage caused concurrently by wind and flood within the $25 million limit.[14] Stewart claims that the district court's reading of the ACC clause creates an absurd result: permitting recovery for damage caused exclusively by wind or exclusively by flood, but barring recovery when the damage is caused by a combination of the two.[15] We agree that this result is absurd and could not have been intended by the parties.

At issue is the interpretation of two ACC clauses contained within section 10 of the Lexington policy and adopted through the RSUI policy's following form provision. The relevant provisions state:

10. PERILS EXCLUDED

This policy does not insure against loss or damage caused directly or indirectly by any of the excluded perils. Such loss or damage is

---

[14] Stewart argues RSUI waived its ACC clause defense. We disagree finding it was adequately raised before the district court.

[15] RSUI also argues that the ACC clause is given a much simpler reading by denying all flood coverage, and that therefore the best reading of the following form clause is that it did not incorporate the Lexington policy's flood sublimits. But this argument proves to much as the ACC clause is contained within the Lexington policy itself and any interpretive difficulties apply to both policies irrespective of RSUI's following form provision.

No.09-30722

excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:

. . .

P.    loss or damage caused by or resulting from:

. . .

> (2)    Flood, unless specified in Section 3, Sublimits of Liability, Paragraph J., and   then  only for such specified amount;
>
> (3)    any and all loss from any other cause when occurring concurrently or sequentially with Earthquake, Volcanic Eruption or Flood, except Fire; . . .[16]

The district court found that P(3) precluded recovery for any damage (including wind) if it was caused concurrently or sequentially by flood, even within the $25 million exception to the flood exclusion.  In other words, Stewart could recover for damage exclusively caused by wind or exclusively caused by flood, but not for damage caused by flood and wind together.  The court "recognize[d] the unusual nature of such an interpretation, but [found] it supported by the policy language."

We acknowledge that the district court's reading is the most straightforward reading of the contract.  There are two ACC clauses in the Lexington policy.  The prefatory clause contains a general ACC clause, barring recovery for any damage caused by an included peril if an excluded peril contributes concurrently or in sequence to the loss.  To the extent P(2) defines flood as an excluded peril, the prefatory clause bars recovery for damage caused by an included peril acting in conjunction with flood.  P(3) provides a separate prohibition from P(2) and states unambiguously that any loss from another cause, occurring concurrently or sequentially with flood, shall be considered an

---

[16]  RSUI Policy § 10(P)(2)-(3).

excluded peril. The clauses appear to overlap, but the prefatory clause does not apply to the $10 million flood sublimit, as it subsumes the exception to the exclusion through P(2). The P(3) independent flood ACC clause does not subsume P(2), creating an independent bar to all damage caused by flood acting concurrently with another peril.

This court generally enforces the plain reading of ACC clauses, even in the face of potential ambiguity caused by the structure of the insurance contract. For instance, in *Leonard v. Nationwide Mutual Insurance Co.*[17] we held an ACC clause barred recovery for damage from storm surge stating "[t]he plain language of the policy leaves the district court no interpretive leeway to conclude that recovery can be obtained for wind damage that occurred concurrently or in sequence with the excluded water damage."[18] The court rejected claims that the policy's definitions of storm surge and windstorm led to ambiguity in the ACC clause—where the damage was caused in part by flood, it was excluded. This conclusion was reinforced by *Tuepker v. State Farm & Casualty Company*.[19] There the plaintiffs sought to show ambiguity in the ACC clause by pointing to a provision setting a higher deductible for hurricane damage. The plaintiffs argued that this indicated the policy covered hurricane damage such as storm surge, and that the ACC clause should not apply. The court rejected the claim and found that "the endorsement does not enlarge or change the scope of

---

[17] 499 F.3d 419 (5th Cir. 2007); *see also Arctic Slope Regional Corporation v. Affiliated FM Ins. Co.*, 564 F.3d 707 (5th Cir. 2009) (upholding ACC clause on essentially same grounds as *Leonard*); *Bilbe v. Belsom*, 530 F.3d 314 (5th Cir. 2008).

[18] *Id.* at 430.

[19] 507 F.3d 346 (5th Cir. 2007).

No.09-30722

coverage under the policy."[20]  In both these cases the court rejected claims of ambiguity finding ACC clauses were unambiguous and enforceable.

But in the above cases and every case cited by RSUI, the ACC clause operated to prevent recovery for damage caused by an included peril occurring concurrently with an excluded peril—e.g., flood damage was explicitly excluded while wind damage was included.  ACC clauses permit parties to contract around common-law causation rules, such as efficient proximate causation. Under this causation rule, an insured may recover for damage caused jointly by an included and excluded peril if the included peril is the "dominant and efficient cause of the loss."[21]  The determination of the dominant cause may be difficult and promote extensive litigation between the parties.  Parties use an ACC clause as a means of avoiding such a dispute.  Yet this rationale does not apply to cases such as this where the insurer seeks to use the ACC clause to bar recovery for damage caused by two included perils.  Here, for damage up to the $25 million sublimit, flood is an included peril.  Thus the court's incongruous result stated above: Stewart can recover for damage caused exclusively by wind or exclusively by flood, but not for damage caused by the two perils acting concurrently.

RSUI's reading turns the rationale for including an ACC clause on its head, creating difficult causation determinations where none otherwise exist. RSUI's interpretation would force the insured to demonstrate that damage was caused exclusively by one of the two included perils.  This reading is untenable and can only be the result of an awkward use of terms that assumes a full exclusion of flood damage.  We will not read the policy to force Stewart to prove

---

[20]  *Id.* at 355.

[21]  *Leonard*, 499 F.3d at 431 (internal citations and quotations omitted).

No.09-30722

a windless flood.  We read the ACC clause to only apply to damage in excess of the $25 million aggregate limit.

* * *

Read objectively, the policy at best does not answer the present claims with sufficient clarity to escape the principle that such uncertainty is to be resolved in favor of the insured.  Reading in favor of the insured, we find the RSUI policy covers flood to the extent the aggregate limits under the Lexington and Lloyd's policies have not been fully paid.  We also find  that the policies' ACC clause does not operate within the $25 million dollar limit.  We AFFIRM in part, REVERSE in part, and REMAND for further proceedings.  Stewart's motion to dismiss the appeal is DENIED.