**Motion for Rehearing Granted, Opinion of December 8, 2011 Withdrawn, Reversed and Remanded, and Opinion filed April 3, 2012.**



In The

# Fourteenth Court of Appeals

_____

### NO. 14-10-00816-CV
_____

### UNITED STATES FIDELITY & GUARANTY CO., Appellant

### V.

### COASTAL REFINING & MARKETING, INC., COASTAL OFFSHORE INSURANCE LIMITED, AND LEXINGTON INSURANCE COMPANY, Appellees

**On Appeal from the 129th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2000-43872**

## OPINION

We grant appellees' motion for rehearing, withdraw our opinion issued December 8, 2011, and issue this opinion in its place.

In this subrogation case, appellant United States Fidelity & Guaranty Co. ("USF&G") challenges a judgment requiring it to pay the limits of its primary and umbrella policies to its insured and two co-insurers. Although we do not agree that the subrogation claims are barred as USF&G contends or that the trial court abused its discretion in awarding attorney's fees, USF&G is correct in asserting that a portion of the

loss should have been prorated among the excess insurers. We therefore reverse the judgment and remand the case to the trial court with instructions to reduce the damage award. However, because the parties stipulated that the amount of attorneys' fees requested was reasonable and necessary, we affirm the trial court's award of $1,039,054.92 in attorney's fees and costs and do not reverse and remand the attorneys' fees award for recalculation in light of the reduced damage award.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The origins of this insurance dispute are recounted in *Coastal Refining & Marketing, Inc. v. United States Fidelity & Guaranty Co.*, 218 S.W.3d 279 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (sub. op.). Briefly, Weaver Industrial Service, Inc. contracted with Coastal Refining & Marketing, Inc. to maintain Coastal's equipment, and Weaver agreed to designate Coastal as an additional insured on insurance policies providing coverage for all claims arising out of Weaver's work. *Id.* at 281–82. Through Weaver, Coastal is an additional insured on two policies issued by USF&G. One is a commercial general liability policy providing $1 million of primary coverage per occurrence, and the other is an umbrella policy providing $5 million of excess coverage.

Coastal also maintained its own primary and excess coverage. The Reliance National Indemnity Company provided $500,000 in primary coverage after payment of a $500,000 self-insured retention.[1] Above this, Coastal's captive insurance company, Coastal Offshore Insurance Limited ("COIL"), provided $1 million in excess coverage. In addition, Coastal had excess coverage of $10 million through a policy from Lexington Insurance Company. The Lexington policy was not excess to a specific policy, but instead provided coverage for losses in excess of an "underlying amount" of $2 million.

---

[1] Because it had a deductible equal to the policy limits, this insurance is a "fronting" policy. In effect, Coastal was responsible for paying the first $500,000 of any losses through its self-insured retention, after which Reliance would pay for $500,000 of the loss, and Coastal would reimburse Reliance for that amount through the $500,000 deductible.

All of the excess policies covering Coastal contained clauses dealing with "other valid and collectible insurance."

In May 1999, there was an explosion on Coastal's property, and Weaver's employee Rolando Lopez was injured. *Id.* at 282. The Lopez family sued Coastal and its parent company, Coastal Corporation, for negligence and gross negligence (the "*Lopez* suit"). *Id.* Coastal initially hired its own defense counsel and expended $161,363 of its $500,000 self-insured retention in defending against the suit. Eventually, however, it asked Lexington to assume defense of the case and tendered the remaining $338,637 of the self-insured retention, the $500,000 limits of the Reliance policy, and the $1 million of excess coverage provided by COIL. Lexington settled the claims against Coastal and Coastal's parent corporation for a total of $7 million. The terms of the settlement agreement did not disclose the extent to which the funds were expended to settle the claims against Coastal, as opposed to settling the claims against Coastal's parent corporation.

Coastal's counsel did not inform USF&G about the *Lopez* suit until about two weeks before the case settled. After learning of the settlement, USF&G sued Coastal, seeking a declaration that it had no duty to indemnify Coastal for the settlement. *Id.* at 283. COIL and Lexington intervened. *Id.* The trial court initially granted summary judgment in USF&G's favor, but we reversed and remanded because USF&G failed to establish that it was actually prejudiced by the late notice of suit or that Coastal failed to cooperate in its defense. *Id.* at 298.

On remand, the parties agreed to submit certain issues to the jury, but stipulated that the priority of coverage was a question of law to be submitted to the trial court. The jury found that (a) all of the $7 million settlement was expended to settle the claims against Coastal and none of this amount was spent to settle the claims against Coastal's parent corporation; (b) USF&G was not prejudiced by the late notice of the *Lopez* suit; (c) Coastal did not fail to cooperate with USF&G; (d) Coastal, COIL, and Lexington (collectively,

3

"the Coastal parties") did not voluntarily pay to settle the *Lopez* suit without USF&G's consent; and (e) USF&G did not deny coverage for the *Lopez* claim.

After receiving the verdict, the parties filed competing motions to disregard certain findings. Coastal asked the trial court to disregard the jury's finding that USF&G did not deny coverage, and argued that the finding was both immaterial and contrary to the conclusive evidence that USF&G constructively denied coverage. USF&G did not specifically oppose the request; moreover, it acknowledged that "even if USF&G had lost on that issue, the result would not change." The trial court granted the request to disregard the finding without stating the ground on which the ruling was based. USF&G asked the trial court to disregard the jury's finding that the entire $7 million settlement was expended to obtain the release of the claims against Coastal. The trial court impliedly denied the motion. On appeal, USF&G does not challenge the disposition of either motion.

The parties addressed the priority of coverage by filing competing motions for judgment. All agreed that if the Coastal parties were entitled to recover from USF&G at all, then the first $1 million of the loss was covered under USF&G's primary policy, and the next $500,000 of the loss was covered under Reliance's primary policy. The Coastal parties argued that USF&G's $5 million excess policy was triggered next, and that COIL's $1 million excess policy would be triggered only when USF&G's excess policy was exhausted. According to the Coastal parties, Lexington's $10 million excess policy would be triggered only when the coverage from all of the other policies was exhausted. Thus, the Coastal parties asked the trial court to award them $6 million, representing the combined coverage limits of USF&G's primary and excess policies.

USF&G moved for entry of judgment on two alternative theories. First, it asked the trial court to rule that COIL and Lexington take nothing because their claims were foreclosed by the Texas Supreme Court's ruling in *Mid-Continent Insurance Company v.*

4

*Liberty Mutual Insurance Company*, 236 S.W.3d 765 (Tex. 2007).[2]  In the alternative, USF&G asked the trial court to allocate responsibility for the first $1 million of the settlement to USF&G's primary policy, and the next $500,000 to Reliance's primary policy.   As for priority among the excess insurers, USF&G argued that COIL's $1 million excess policy must be exhausted before USF&G's umbrella policy was triggered, but that Lexington's policy was triggered when the amount of the loss reached $2 million.   Thus, in allocating the responsibility for the $5.5 million of the settlement that was not covered by the primary policies, USF&G asked the trial court to require COIL to pay the first $500,000 of excess coverage, at which time the underlying loss would equal $2 million and Lexington's policy would be triggered.   Relying on *Hardware Dealers Mutual Fire Insurance Co. v. Farmers Insurance Exchange*, 444 S.W.2d 583 (1969), USF&G argued that because the other-insurance clauses of the COIL and Lexington policies were mutually repugnant, those two insurers must contribute pro rata in proportion to their remaining coverage limits until COIL's coverage was exhausted.   Because the other-insurance clauses of the USF&G and Lexington excess policies also were mutually repugnant to each other, USF&G argued that the remainder of the settlement must be allocated between them in proportion to their remaining coverage limits.   The net effect of this proposed allocation was that USF&G would be responsible for $2,249,796 of the $7 million settlement.

The parties also disagreed as to whether the Coastal parties would be entitled to recover attorney's fees even if they prevailed on all of their claims.   The Coastal parties pleaded for an award of attorney's fees based on two chapters of the Texas Civil Practice & Remedies Code—Chapter 37, in which the legislature authorized an attorney's-fee award to any party in a declaratory-judgment action, and Chapter 38, under which one who prevails in a breach-of-contract claim is entitled to recover attorney's fees if certain requirements are met.   USF&G stipulated that the Coastal parties' attorney's fees were reasonable and necessary, but argued that the Coastal parties did not satisfy the

---

[2] In this argument, USF&G did not address the claims of Coastal itself.

5

requirements for recovering attorney's fees in a breach-of-contract claim. According to USF&G, this failure foreclosed the Coastal parties from recovering under either statute on which they relied.

The trial court ruled in favor of the Coastal parties on all issues, and awarded them $6 million in damages—an amount equal to the combined coverage limits of the USF&G primary and umbrella policies—as well as $1,039,054.92 in attorney's fees and taxable court costs, together with pre- and post-judgment interest. The trial court awarded additional attorney's fees in the event that USF&G filed post-judgment motions, and appellate attorney's fees in the event that USF&G filed an unsuccessful appeal. USF&G's motion for new trial was overruled by operation of law, and USF&G superseded the judgment and timely appealed.

## II. ISSUES PRESENTED

USF&G presents three issues for our review. In its first issue, USF&G contends that the trial court erred in failing to allocate responsibility for the settlement funds between the excess insurers on a pro rata basis as required under the holding of *Hardware Dealers*. In its second issue, USF&G argues in the alternative that any right to payment that COIL and Lexington otherwise might have had was foreclosed by the Texas Supreme Court's holding in *Mid-Continent*. USF&G argues in its third issue that the attorney's-fee award must be reversed because the Coastal parties failed to meet the requirements to recover fees in a breach-of-contract action.

## III. ANALYSIS

USF&G's first two issues concern the trial court's disposition of the competing motions for judgment on the priority of the coverage afforded under the various policies. In matters tried to the bench, parties may move for judgment in much the same way that they may move for directed verdict in a jury trial. One difference, however, is the standard of review on appeal. *Sanchez v. Marine Sports, Inc.*, No. 14-03-00962-CV, 2005 WL 3369506, at *1 (Tex. App.—Houston [14th Dist.] Dec. 13, 2005, no pet.) (mem. op.)

6

(citing *Grounds v. Tolar Indep. Sch. Dist.*, 856 S.W.2d 417, 422 (Tex. 1993) (Gonzalez, J., concurring)).   In the appeal of a successful motion for judgment, the sufficiency of the evidence may be challenged as in any other non-jury case.   *Sanchez*, 2005 WL 3369506, at *1.   In this appeal, USF&G does not challenge any actual or implied findings of fact, but instead contends that the trial court misapplied the law in failing to follow binding precedent and in awarding attorney's fees in disregard of statutory requirements.   These are questions of law, and as such, we review them de novo.   *See id.*

Because it is potentially dispositive, we begin our review with USF&G's second issue.

**A.     Applicability of *Mid-Continent Insurance Co. v. Liberty Mutual Insurance Co.***

In its broadest argument, USF&G maintains that the Texas Supreme Court's holding in *Mid-Continent Insurance Co. v. Liberty Mutual Insurance Co.* bars COIL and Lexington's claims for subrogation.   The Coastal parties contend that the case is distinguishable.   We therefore begin with the facts and reasoning of that case.

In *Mid-Continent*, a general contractor was the named insured on two insurance policies issued by Liberty Mutual Insurance Company.   *Mid-Continent*, 236 S.W.3d at 769.   One provided $1 million of primary liability coverage, and the other provided $10 million of excess coverage.   *Id.*   The contractor also was an additional insured on a subcontractor's $1 million primary policy issued by Mid-Continent Insurance Company. *Id.*   Both of the primary insurance policies contained the following other-insurance clause:

> 4.     Other Insurance.
>
> If other valid and collectible insurance is available to the insured for a loss we cover . . . , our obligations are limited as follows:
>
> a.     Primary Insurance
>
> If this insurance is primary our obligations are not affected unless any of the other insurance is also primary.   Then, we will share with all that other insurance by the method described in c. below.

7

c.     Method of Sharing

> If all of the other insurance permits contribution by equal shares, . . . each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

> If any of the other insurance does not permit contribution by equal shares, we will contribute by limits.   Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

*Id.*   Both insurers acknowledged their obligation to defend and indemnify the insured, and they agreed that a jury verdict against the insured would be in the range of $2 to $3 million. *Id.* at 669–70.   Liberty Mutual believed that a jury would find the insured to be sixty percent liable, but Mid-Continent anticipated a fault finding of only ten percent.  *Id.* at 770.   Liberty Mutual agreed to settle the case for $1.5 million[3] and demanded that Mid-Continent pay half, but Mid-Continent refused to pay more than $150,000.[4]  *Id.* Liberty Mutual paid for the remainder of the settlement using the $1 million limits from the primary policy and $350,000 of the coverage afforded under its excess policy.  *Id.* Liberty Mutual then sued Mid-Continent to recover the amount by which Liberty Mutual's payment exceeded its share of the settlement.   *Id.*

In its opinion, the Supreme Court of Texas addressed subrogation and contribution in the context of claims between liability insurers.   The court explained that when asserting a subrogation claim, "the insurer stands in the shoes of the insured, obtaining only those rights held by the insured against a third party, subject to any defenses held by the third party against the insured."   *Id.* at 774.   Although this is true of both contractual and equitable subrogation, the two are slightly different.

---

[3] This is the amount that would be due if the insured were to be found 60% liable for a $2.5 million judgment.

[4] This figure would be equal to Mid-Continent's half of the judgment if the insured were found to be only 10% liable for the same $2.5 million judgment.

Contractual subrogation is created by policy language in which the insurer, in exchange for payment of the loss, receives the insured's rights against the third party who was primarily liable for the payment. *Id.* Because the insurer pursuing a subrogation claim is exercising its insured's rights, the third party may assert any defenses to the claim just as if the insured brought the claim directly. *Id.* But, an insured's right to indemnification under a liability policy extends no further than the amount of the loss. *Id.* at 775. Because the insured's right of indemnity under a liability policy is limited to the actual amount of the loss, an insured that has been fully indemnified by one of its insurers has no right to an additional recovery from another of its insurers. *See id.* at 775. And because it had been fully indemnified for its loss, the court held that the insured in *Mid-Continent* had no claim against the non-paying insurer, and thus, there was no claim to which Liberty Mutual could be contractually subrogated. *Id.* at 775.

Unlike contractual subrogation, equitable subrogation is not dependent on the terms of the policy, but instead "arises in every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity should have been paid by the latter." *Id.* at 774; *accord*, *Frymire Eng'g Co., Inc. ex rel. Liberty Mut. Ins. Co. v. Jomar Int'l, Ltd.*, 259 S.W.3d 140, 144 (Tex. 2008). The court explained in *Mid-Continent* that as a result of the pro rata clauses, each primary insurer agreed to pay only its proportionate share of a loss. *Mid-Continent*, 236 S.W.3d at 772. Under these circumstances, a "co-insurer paying more than its contractually agreed upon proportionate share does so voluntarily; that is, without a legal obligation to do so." *Id.* Liberty Mutual had no obligation under the policy's terms to pay more than its pro rata share of the loss; thus, it could not recover in equitable subrogation because it was unable to show that it had not acted voluntarily. *See id.* at 774–75.

USF&G argues that the holding of *Mid-Continent* applies to bar COIL and Lexington's subrogation claims, but the facts of the two cases differ significantly. Although the court's holding in *Mid-Continent* was based in part on its conclusion that

Liberty Mutual voluntarily paid more than its share of the settlement, the jury in this case found that none of the Coastal parties voluntarily paid to settle the underlying claim. USF&G did not challenge this finding in the trial court or on appeal.

USF&G's position also is completely unlike that of Mid-Continent Insurance Co. Mid-Continent discharged its obligations to its fully indemnified insured by joining in its defense and contributing to the settlement, but USF&G has not discharged its obligations to its insured, despite the undisputed fact that Coastal has not been fully indemnified. To the contrary, even though USF&G admits that the first $1 million of the settlement was covered under USF&G's primary policy, USF&G paid nothing, but instead left Coastal to contribute most of its self-insured retention toward the cost of settlement. A decade later, USF&G still has not indemnified this covered loss.

The other-insurance clauses of the policies at issue in this case also differ from those in *Mid-Continent*. The primary policies in *Mid-Continent* contained identical—and compatible—pro rata other-insurance clauses that limited each insurer's indemnity obligation. Here, nothing limited USF&G's indemnity obligation as Coastal's primary insurer. The primary policies plainly provided that the USF&G policy was triggered first, and the Reliance policy was excess to primary policies in which Coastal was an additional insured. The other-insurance clauses of the USF&G, COIL, and Lexington excess policies also differ from those at issue in *Mid-Continent*. We are not presented with compatible pro rata other-insurance clauses, but with conflicting clauses, each of which purports to make the coverage afforded by the policy excess to any other coverage. As explained below, the other-insurance clauses of the excess policies in this case, unlike the clauses at issue in *Mid-Continent*, are mutually repugnant. *See infra* at Section III.B.

In sum, this is not a case in which similar facts dictate similar results. Because the facts of *Mid-Continent* are significantly unlike those presented here, we conclude that it is inapplicable, and we overrule USF&G's second issue.

**B.    Applicability of *Hardware Dealers Mutual Fire Insurance Co. v. Farmers Insurance Exchange***

In an alternative argument, USF&G contends that the other-insurance clauses of the excess insurance policies are mutually repugnant, and thus, under the precedent established in *Hardware Dealers Mutual Fire Insurance Co. v. Farmers Insurance Exchange*, these insurers must contribute to the settlement on a pro rata basis.   We agree.

The facts of *Hardware Dealers* resemble those presented here.   In *Hardware Dealers*, Anita Hyde was involved in an auto accident while she was test-driving a vehicle owned by a dealership, and the driver of the other vehicle sued her.   *Id.* at 584.   Hyde was potentially covered by two primary insurance policies.   *Id.*   The dealership's policy was issued by Hardware Dealers and contained an "escape clause."   *Id.*   The policy covered any permissive driver of one of the dealership's vehicles, "but only if no other valid and collectible automobile liability insurance, either primary or excess . . . is available to such person."   *Id.* at 586.   Hyde also was covered by a policy issued to her father by Farmers Insurance Exchange.   *Id.* at 584.   That policy contained an other-insurance clause providing that "the insurance with respect to a . . . non-owned automobile shall be excess insurance over any other valid and collectible insurance."   *Id.* at 585–86.   As the court explained the conflict, "Farmers says it owes excess liability only because of Hardware's other insurance; Hardware says its escape clause is the more specific of the two clauses and it escapes all liability."   *Id.* at 584.

The court held that when, from the insured's point of view, coverage is afforded "from either one of two policies but for the other, and each contains a provision which is reasonably subject to a construction that it conflicts with a provision in the other concurrent insurance, there is a conflict in the provisions."   *Id.* at 590.   The court considered and rejected Hardware's argument that the more specific other-insurance clause prevails.   The court explained that this method of determining priority "encourages the continuing battle of draftsmanship" but is "no better" than other methods that "had been described as a

11

mechanical application of some arbitrary test." *Id.* at 588. Instead, the court concluded that when faced with conflicting other-insurance clauses, "'the only reasonable result to be reached is a proration between the two insurance companies in proportion to the amount of insurance provided by their respective policies.'" *Id.* at 590 (quoting *United States Auto. Ass'n v. Hartford Accident & Indem. Co.*, 414 S.W.2d 836 (Tenn. Sup. Ct. 1967)).

Here, we are faced with conflicting other-insurance clauses in the excess policies. In each of these clauses, the insurer attempts to make the policy excess to any other policy in which it is not identified as underlying insurance. USF&G's policy provides, "This insurance is excess over any other valid and collectible insurance whether primary, excess, contingent, or on any other basis, except other insurance written specifically to be excess over this insurance." The COIL and Lexington policies do not identify the USF&G umbrella policy as underlying insurance; thus, one who read the USF&G policy first would conclude that it is excess to the COIL and Lexington policies. Those policies, however, likewise have other-insurance clauses, providing, "If other valid and collectible insurance is available to the Insured covering a Loss also covered by this Policy, other than insurance that is specifically in excess of this Policy, the insurance afforded by this Policy shall be in excess of and shall not contribute with such other insurance." The USF&G policy does not identify the COIL and Lexington policies as underlying insurance; thus, one who read these policies first would conclude that they are excess to the USF&G umbrella policy. This is the just the kind of "circular riddle" described—and solved—in *Hardware Dealers*. *See id.* at 589 (explaining that the other-insurance clauses of two policies conflict if the reader would reach one conclusion by reading a particular policy first, but would reach the opposite conclusion by reading the other policy first); *id.* at 590 (holding that if one would reach opposite conclusions depending on which policy was read first, then "the only reasonable result" is proration).

The Coastal parties contend that the other-insurance clauses of the excess policies are not mutually repugnant if one considers the overall pattern of the insurance from

12

Coastal's point of view. *See Hardware Dealers*, 444 S.W.2d at 589; *accord*, *Liberty Mut. Ins. Co. v. United States Fire Ins. Co.*, 590 S.W.2d 783, 785 (Tex. App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.). They argue that because Weaver and Coastal had a service agreement in which Weaver agreed to provide primary coverage to Coastal, Coastal intended and expected that its own insurance would be excess to the coverage obtained by Weaver. Our analysis, however, does not depend on Coastal's intent regarding the effect of its agreement with Weaver. Insurance policies are contracts, and we interpret the parties' intent "as reflected in the terms of the policy itself." *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 831 (Tex. 2009). None of the insurers were parties to the agreement between Weaver and Coastal, and while the service agreement may provide context, we cannot read it as varying or contradicting the policies' terms. *Cf. Houston Exploration Co.v. Wellington Underwriting Agencies, Ltd.*, 54 Tex. Sup. Ct. J. 1683, 2011 WL 3796361, at *4 (Tex. Aug. 26, 2011) (evidence concerning the parties' negotiations can provide context, but the parol evidence rule prohibits consideration of extrinsic evidence to contradict the policy's text).

The Coastal parties also point out that the holding of *Hardware Dealers* does not apply to policies that are not of the same character and level. *See Carrabba v. Employers Cas. Co.*, 742 S.W.2d 709, 715 (Tex. App.—Houston [14th Dist.] 1987, no writ). They assert that "USF&G's umbrella policy is a quasi-primary policy," because in some circumstances, USF&G's policy provides primary coverage, whereas Lexington's policy is always excess. This is incorrect; both the USF&G and Lexington excess policies contain clauses indicating that each potentially could provide "drop down" coverage in some circumstances. More importantly, however, we are concerned with the character of the policy as shown by the pattern of coverage within each policy, not in exceptions that might be triggered in circumstances that are not presented. *See id.* at 714 (explaining that we "examin[e] the overall pattern of insurance and constru[e] the policy as a whole," and noting that a policy "generally afforded primary coverage" where it provided excess coverage only because the insured was operating a hired vehicle).

13

The Coastal parties also assert that the COIL and Lexington policies are excess to the USF&G umbrella policy because they are more specific.   They point out that the COIL and Lexington other-insurance clauses contain language that those policies "shall not contribute with" any other insurance, and cite authority in which the authoring court held that, as between two polices with competing other-insurance clauses, a policy containing the more specific language is excess to a policy in which the language was less specific. *See Atl. Mut. Ins. Co. v. Truck Ins. Co.*, 797 F.2d 1288 (5th Cir. 1986).   That case, however, was decided under New York law.   *Id.* at 1292.   We are bound by Texas precedent, and the Supreme Court of Texas considered and rejected the approach that the Coastal parties advocate.   *See Hardware Dealers*, 444 S.W.2d at 588–89.

Finally, the Coastal parties state that the other-insurance clause in the Lexington excess policy does not conflict with that of the USF&G policy because the conditions triggering coverage under the USF&G umbrella policy occur before those triggering coverage under the Lexington policy.   The excess coverage provided by the COIL and USF&G excess policies are triggered upon the exhaustion of the primary coverage ($1 million of which is provided by the USF&G primary policy, and $500,00 of which is provided by the Reliance policy).   Lexington's excess policy, on the other hand, is triggered when the loss exceeds $2 million.   Because the USF&G and COIL excess policies are triggered first, the Coastal parties assert that the limits of those policies must be exhausted before the Lexington policy is triggered.   But in each of the cases they cite in support of this proposition, the terms of the excess policies at issue provided that coverage would be triggered only on the exhaustion of specifically identified underlying insurance policies.   *See, e.g.*, *Utica Nat'l Ins. Co. v. Fid. & Cas. Co*, 812 S.W.2d 656, 559–560 (Tex. App.—Dallas 1991, writ denied) (concluding that where excess coverage is triggered only on the exhaustion of specified underlying insurance policies and the settlement is less than the limits of the underlying policy, then the excess policy is not triggered); *Stewart Enters. v. RSUI Indem. Co.*, 614 F.3d 117, 119–121 (5th Cir. 2010) (per curiam) (applying Louisiana law to the interpretation of ambiguous following-form provisions of policies that

14

were excess to specifically identified underlying insurance); *Interco, Inc. v. Nat'l Sur. Corp.*, 900 F.2d 1264, 1265–68 (8th Cir. 1990) (applying Missouri law and concluding that second- and third-tier excess policies were not triggered when the specifically identified underlying first-tier policy was not exhausted, and did not "drop down" due to the first-tier insurer's insolvency). Here, however, Lexington did not provide coverage that was excess to a specifically identified policy and that was triggered only on the exhaustion of that policy's limits; instead, it provided coverage excess of an "underlying amount" of $2 million. That amount could be reached without exhausting the limits of the COIL and USF&G policies.

In sum, we agree with USF&G that the other-insurance clauses of the COIL, Lexington, and USF&G excess policies are mutually repugnant. Because coverage under these circumstances is prorated among the insurers, the Coastal parties are entitled to recover only a portion of the funds expended in settling the *Lopez* suit.

## C. Effect of *Hardware Dealers*

USF&G contends that if *Hardware Dealers* applies, then the order in which the policies are triggered and the extent of contribution from each is as stated below.[5] The Coastal parties have not disputed that this allocation is correct if, as we have found, pro rata contribution is required under *Hardware Dealers,* and coverage under Lexington's policy is triggered before the USF&G and COIL excess policies are exhausted. We therefore determine the extent of USF&G's liability based on the following allocation:

The USF&G primary policy was triggered first, and under it, USF&G was required to contribute $1 million toward the cost of settling the *Lopez* suit. The Reliance primary policy afforded coverage for the next $500,000 of the ultimate net loss. In contrast, excess insurers do not contribute until the primary policies are exhausted. *St. Paul Mercury Ins.*

---

[5] The allocation USF&G proposes on appeal differs from the allocation it proposed in the trial court in that it has abandoned its earlier contention that the COIL policy must be exhausted before the USF&G umbrella policy is triggered.

*Co. v. Lexington Ins. Co.*, 78 F.3d 202, 209 & n.23 (5th Cir. 1996); *Emscor Mfg., Inc. v. Alliance Ins. Group*, 879 S.W.2d 894, 903 (Tex. App.—Houston [14th Dist.] 1994, writ denied). Thus, the two primary policies together provided coverage for the first $1.5 million of the loss, leaving $5.5 million of the $7 million *Lopez* settlement to be allocated among the excess insurers.

With the exhaustion of the primary policies, the COIL and USF&G excess policies were triggered, but the Lexington policy was not. Lexington provided coverage only for losses in excess of $2 million, and by the time that the primary coverage was exhausted and COIL and USF&G's excess policies were triggered, only $1.5 million was required to have been paid. Thus, the next $500,000 of liability is allocated between COIL and USF&G. COIL provided $1 million of excess coverage, and USF&G provided $5 million of excess coverage. Thus, of the combined excess coverage of $6 million that had been triggered at this time, USF&G provided 5/6 of the coverage and COIL provided 1/6. Consequently, 5/6 of the next $500,000—an amount equal to $416,667—is allocable to USF&G, and the remaining 1/6, totaling $83,333, is allocable to COIL.

Payment of these sums would cover $2 million of the $7 million settlement, and would trigger coverage under the Lexington policy, which provided coverage for losses in excess of an underlying amount of $2 million. Thus, the remaining $5 million of the *Lopez* settlement is apportioned between the COIL, USF&G, and Lexington policies on a pro rata basis. USF&G asks that we allocate the loss among the three excess insurers in proportion to the remaining coverage available under each policy, and although the Coastal parties contend that proration is not required because, in their view, all of their policies are excess to the USF&G policies, they do not dispute that this formula is otherwise appropriate. We therefore employ it.

When the Lexington policy was triggered, $4,583,333 remained of the coverage afforded by USF&G's umbrella policy; $916,667 remained of COIL's excess coverage; and Lexington's $10 million of coverage was untouched. Together, the three policies

16

afforded $15.5 million of coverage. To allocate the remaining $5 million of the *Lopez* settlement, we divide each insurer's remaining coverage by the total remaining coverage, then multiply the resulting figure by $5 million. Using this formula, COIL's remaining share of the loss is ($916,667/$15,500,000) x $5,000,000, which is equal to $295,699. USF&G's share is ($4,583,333/$15,500,000) x $5,000,000, or $1,478,495. And Lexington's share of the loss is ($10,000,000/$15,500,000) x $5,000,000, which equals $3,225,806. Adding together all of the amounts owed by USF&G—$1 million of primary coverage; $416,667 of the first $500,000 of excess coverage; and $1,478,495 of the remaining excess coverage—we arrive at a total of $2,895,162.

Thus, we sustain USF&G's first issue and hold that USF&G is liable to the Coastal parties for the amount of $2,895,162, exclusive of interest, attorney's fees, and costs.

## D.     Attorney's Fees

In its final issue, USF&G challenges the trial court's award to the Coastal parties of their reasonable and necessary attorney's fees. We review a trial court's award of attorney's fees for abuse of discretion. *Bocquet* v. *Herring*, 972 S.W.2d 19, 20 (Tex. 1998). A trial court abuses its discretion when it fails to analyze or apply the law correctly. *In re Sw. Bell Tel. Co.*, 226 S.W.3d 400, 403 (Tex. 2007) (citing *In re Kuntz*, 124 S.W.3d 179, 181 (Tex. 2003)).

The Coastal parties sought attorney's fees under two different statutory provisions. Under Chapter 38 of the Texas Civil Practice and Remedies Code, the trial court must award attorney's fees to a litigant who prevails in breach-of-contract claim if (1) the claimant was represented by an attorney, (2) the claimant presented the claim to the opposing party or the party's agent, and (3) the opposing party did not "tender payment for the just amount owed" within thirty days after the claim was presented. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2008) (permitting recovery of reasonable attorney's fees "in addition to the amount of a valid claim and costs" in a breach-of-contract action); *id.* § 38.002 (setting forth requirements of representation,

presentment, and non-payment); *Smith v. Patrick W.Y. Tam Trust*, 296 S.W.3d 545, 547 (Tex. 2009) ("If attorney's fees are proper under section 38.001(8), the trial court has no discretion to deny them."). Under Chapter 37 of the same code, attorney's fees also are available in proceedings pursuant to the Uniform Declaratory Judgments Act. *Id.* § 37.009. In a declaratory-judgment action, "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." *Id.*

USF&G argues that because the Coastal parties failed to obtain a jury finding that USF&G breached its insurance contract, they are not entitled to recover attorney's fees under Chapter 38 in connection with their breach-of-contract claims. In addition, USF&G contends that the Coastal parties did not present their claims and could not have done so before the jury returned a verdict in this case. This is so, USF&G argues, because the *Lopez* claimants sued both Coastal and Coastal's parent company, and although COIL and Lexington insured both of these entities, USF&G did not insure Coastal's parent company. USF&G asserts that the Coastal parties could not validly present their claim until the jury determined what percentage of the settlement funds were expended for release of the claims against USF&G's insured.

USF&G then asserts that an award of attorney's fees under the Uniform Declaratory Judgments Act "is improper for the same reasons"—even though attorney's fees may be awarded under this Act to a party who presented no claims, and even where the declaratory judgment sought concerns a question of law on which no jury finding is necessary. According to USF&G, if the Coastal parties are not entitled to recover attorney's fees under Chapter 38 for their breach-of-contract claim, they cannot recover fees under Chapter 37 under the Uniform Declaratory Judgments Act because "a party cannot use the Act as a vehicle to obtain otherwise impermissible attorney's fees." It is true that "when a claim for declaratory relief is merely tacked onto a standard suit based on a matured breach of contract, allowing fees under Chapter 37 would frustrate the limits Chapter 38 imposes on such fee recoveries." *MBM Fin. Corp. v. Woodlands Operating Co., L.P*, 292 S.W.3d

18

660, 670 (Tex. 2009). A party cannot convert a claim for which attorney's fees are not recoverable into a claim for which a fee award is available simply by restyling the claim as a request for declaratory judgment. *Id.* at 690. From this premise, USF&G reasons that if the Coastal parties cannot recover attorney's fees for their breach-of-contract claim, they cannot recover the fees under the Uniform Declaratory Judgments Act.

The problem with this argument is that it was USF&G that filed this suit for declaratory judgment, and attorney's fees can be recovered by a party in a declaratory-judgment action even if that party asserts no other claim. *See id.* at 669 ("[T]he Declaratory Judgments Act allows fee awards to either party in all cases."); *Chappell Hill Bank v. Smith*, 257 S.W.3d 320, 331 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (stating that the statute supports an award to either side in a declaratory-judgment action). The record before us shows that when the Coastal parties pleaded for an award of attorney's fees under the Act, they had not asserted a breach-of-contract claim. Although they later filed counterclaims for both breach of contract and declaratory judgment, USF&G suggests no reason for its apparent assumption that by asserting claims of their own for which attorney's fees potentially were available, the Coastal parties lost the ability to recover attorney's fees in connection with USF&G's declaratory-judgment claim.

We overrule USF&G's third issue. Because the Coastal parties were eligible for an attorney's-fee award in connection with USF&G's suit for declaratory judgment, we need not consider whether they would have been entitled to the same award in connection with their breach-of-contract claims. In this case, the parties stipulated that the amount of attorneys' fees requested was reasonable and necessary. We therefore affirm the trial court's award of $1,039,054.92 in attorney's fees and costs notwithstanding any reduction of the damages award.

19

## IV. CONCLUSION

Because the trial court erred in failing to prorate a portion of the covered loss among COIL, Lexington, and USF&G, we reverse the judgment and remand the case with instructions to the trial court to (a) reduce the damage award from $6 million to $2,895,162, and (b) reduce the interest award in accordance with the reduced damages.


/s/  Tracy Christopher
    Justice


Panel consists of Justices Anderson, Brown, and Christopher (Anderson, J., not participating on rehearing).