**Opinion issued June 28, 2018**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-16-00848-CV

———————————

**LION CO-POLYMERS HOLDINGS, LLC, Appellant**

**V.**

**LION POLYMERS, LLC, Appellee**

\*\*\*\*\*\*\*\*\*\*

**LION POLYMERS, LLC, Cross-Appellant**

**V.**

**LION CO-POLYMERS HOLDINGS, LLC, AFWEST CHEMICALS, LTD., AND VIJAY GORADIA, Cross-Appellees**

On Appeal from the 190th District Court
Harris County, Texas
Trial Court Case No. 2014-10394

**MEMORANDUM OPINION**

Appellant, Lion Co-Polymers Holdings, LLC (the "Company"), challenges the trial court's summary judgment granted in favor of appellee, Lion Polymers, LLC ("LP"), on LP's breach-of-contract claim against the Company. In six issues, the Company contends that the trial court erred in granting summary judgment and awarding damages and attorney's fees.

In its conditional cross-appeal, LP contends that the trial court erred in granting summary judgment in favor of cross-appellee, the Company, on LP's claim against it for breach of the implied covenant of good faith and fair dealing; granting summary judgment in favor of cross-appellee, AFWest Chemicals, Ltd. ("AFWest"), on LP's claims against it for breach of contract, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and unjust enrichment; and granting summary judgment in favor of cross-appellee, Vijay Goradia ("Goradia"), on LP's claims against him for breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and unjust enrichment.

We modify the trial court's judgment and affirm as modified.

# Background[1]

The Company, a Delaware Limited Liability Company, manufactures synthetic rubber used in the automotive and construction industries. The amended "LLC Agreement" (the "Agreement"), under which the Company was formed, provides that the Company's "members" share in the Company's profits through tiered distribution provisions, or "waterfalls," based on the type and quantity of "units," or fractional membership interests in the Company, that each member holds. For instance, the first tier of the distribution waterfall must be completely satisfied before the next tier receives any distributions, and so forth until the waterfall is satisfied or funds are exhausted.

Specifically, the Agreement, at section 6.01, provides for a waterfall distribution of "Available Funds," as follows:

(a) Subject to Section 4.02(d)(ii) [applicable to holders of Class 1 Preferred Units] and after giving effect to Section 6.01(b), to the extent the Board determines that (i) the Company has funds on hand available for distribution to the Members (after payment of all then-due obligations of the Company and the establishment of reasonable reserves for the Company's liabilities, obligations, working capital and other anticipated needs, including any distribution required under Section 6.01(c)) (hereinafter "Available Funds") and (ii) it is appropriate to make any such distribution of Available Funds, then the Board shall (subject to any contractual or legal restraints that may be applicable to the Company, such as restraints under the Loan and Security

---

[1] Only those facts pertinent to a resolution of the appeal are stated. Because, as discussed below, we do not reach the issues presented in LP's conditional cross-appeal, the facts underlying those issues are not presented.

3

Agreement and any other applicable debt covenants) declare and make distributions of Available Funds as follows:

(i) First, to the Holders of Class 4 Common Units…

(ii) Next, to the Holders of Class 1 Preferred Units…

(iii) Thereafter, to Holders of Class 2 Common Units, Class 3 Common Units and Class 4 Common Units pro rata in proportion to the number of such Units; provided, however:

. . . .

(B) Any distribution payable in respect of a Class 3 Common Unit pursuant to this Section 6.01 shall not be distributed in respect of such Class 3 Common Unit (but instead shall be distributed among the other Holders pursuant to the applicable provision of Section 6.01) until the cumulative amount of distributions foregone in respect of such Class 3 Common Unit pursuant to this Section 6.01(a)(iii) is equal to the Strike Price of such Class 3 Common Unit.

(b) Notwithstanding the provisions of Section 6.01, any Available Funds attributable to the receipt of DSM Amounts shall be distributed to the Holders of Class 2 Common Units pro rata in proportion to the number of Class 2 Common Units held.

(c) Notwithstanding the provisions of Sections 6.01(a)(iii), 6.01(b) and 6.02, if at the time of any distribution under Sections 6.01(a)(iii), 6.01(b) and 6.02, the Unreturned Class 5 Capital or the Unpaid Class 5 Return is greater than zero, then any amounts otherwise distributable to Holders of Class 2 Common Units or Class 3 Common Units pursuant to Section 6.01(a)(iii), 6.01(b) or 6.02 shall instead be distributed to Holders of Class 5 Common Units until (i) the Unreturned Class 5 Capital has been reduced to zero and then (ii) the Unpaid Class 5 Return has been reduced to zero.

Section 6.01(d) also provides for certain "Tax Distributions," as follows:

> On each Tax Distribution Date, the Company shall, to the extent the Board determines such amounts to be available for distribution, make distributions to the Members in such amounts as the Board determines are sufficient to satisfy the Members' projected estimated income tax liability with respect to the Company's income allocable to their Units for such period, including an reallocation of amounts of income to a Member which may occur due to the allocations provided in Section 6.05(a). Such tax liability will be calculated as though each Member were an individual residing in the State of New York based upon the highest marginal income tax rates, taking into account U.S. federal, state, and local income taxes . . . , which the Board estimates are applicable, utilizing the respective rates for ordinary income or capital gains, depending on the characterization of the Company's estimated income for such period. Any distribution made to a member pursuant to this Section 6.01(d) shall be treated as an advanced distribution of, and shall reduce, the amounts next distributable to such Member pursuant to Section 6.01 or 6.02.

Further, section 6.02 of the Agreement provides a distribution waterfall that governs how and to whom proceeds are to be paid after a "Recapitalization Transaction." The Agreement defines a Recapitalization Transaction as "the financing or refinancing of debt secured by the assets of the Company" in an amount in excess of $10,000,000 in the aggregate and followed by the distribution of all or a significant portion of such amounts to the members existing as of such date. Section 6.02, in pertinent part, provides:

> (1) . . . [U]pon a Recapitalization Transaction, after adjusting the Capital Accounts for all distributions made under Section 6.01 and all allocations under this Article 6, all available proceeds

distributable to the Members shall be distributed to the Members as follows:

(a) First, to the Holders of Class 4 Common Units in an amount equal to the amounts owed to such Holders . . . ; provided that if the amount available to be distributed hereunder is not sufficient to repay such amounts, then such distribution shall be made to such Holders pro rata in accordance with the amounts owed.

(b) Next, to the Holders of Class 1 Preferred Units until their Unpaid Class 1 Return is eliminated; provided that if the amount available to be distributed hereunder is not sufficient to eliminate such Unpaid Class 1 Return, then such distributions shall be made to the Holders of Class 1 Preferred Units pro rata in accordance with the Unpaid Class 1 Return owed to each of them at the time of distribution.

(c) Next, to the Holders of Class 1 Preferred Units until their Unreturned Class 1 Capital is eliminated; provided that if the amount available to be distributed hereunder is not sufficient to eliminate such Unreturned Class 1 Capital, then such distributions shall be made to the Holders of Class 1 Preferred Units pro rata in accordance with their Unreturned Class 1 Capital as of the time of distribution.

(d) Thereafter, to the Holders of Class 2 Common Units, Class 3 Common Units, and Class 4 Common Units (but not the holders of Class 1 Preferred Units) pro rata in proportion to the number of such Units.

(Emphasis added.)

In 2007, the Company admitted LP as a "Member of the Company," and, "[i]n exchange for the performance of services rendered or to be rendered to or for the benefit of the Company," issued to LP 1,964,492 "Class 3 Common Units." These Class 3 Common Units were intended to qualify as "profits interests," within the

6

meaning of Revenue Procedures 93–27 and 2001-43,[2] and the Agreement provides that the parties intended that it be interpreted accordingly.

It is undisputed that, in the summer of 2011, the Company obtained $300,000,000 in financing that allowed it to refinance its existing debt and to provide $150,000,000 in distributions to its members. The parties dispute whether the Company paid LP's its portion of the distributions in accordance with the applicable terms of the Agreement.

LP, in its second amended petition, alleged that, on August 25, 2011, it received a letter from the Company stating that it intended to make a distribution to its members in September (the "2011 Distribution"). In the letter, the Company stated that it intended to deduct from its distribution to LP, for its Class 3 Common Units, a "Strike Price" of $1.00 per unit. According to the Agreement, the "strike

---

[2] A limited liability company, as here, is sometimes treated as a partnership for tax purposes. *See, e.g.*, *Fin. Strategy Grp., PLC v. Lowry*, No. 01-14-00273-CV, 2015 WL 452265, at *3 (Tex. App.—Houston [1st Dist.] Jan. 27, 2015, no pet.) (mem. op.). Internal Revenue Service ("IRS") Revenue Procedure 93–27 defines a "profits interest" as "a partnership interest other than a capital interest." Rev. Proc. 93–27, sec. 2.02; *see also* Steven B. Gorin, *Income Tax Exit Strategies From Businesses*, CY020 ALI-CLE 981 (2017) ("'Profits interest' means an interest in the partnership's future income, gains, deductions, and losses, with a zero beginning capital account so that, if entity dissolved at the time of transfer, the holder would receive nothing."). A "capital interest is an interest that would give the holder a share of the proceeds if the partnership's assets were sold at fair market value and then the proceeds were distributed in a complete liquidation of the partnership." Rev. Proc. 93–27, sec. 2.01. The determination of whether a partnership interest is a capital interest or a profits interest is made "at the time the interest is granted, even if, at that time, the interest is substantially nonvested." Rev. Proc. 2001–43, sec. 3, 2001–2 C.B. at 191.

7

price," with respect to a Class 3 Common Unit issued as of the effective date of the Agreement, June 29, 2007, as here, is its "Original Issue Price" of $1.00 per unit. LP alleged that, despite its request to the Company that it make the 2011 Distribution in accordance with the Agreement, the Company nevertheless improperly deducted, as a "strike-price deduction," $1,964,492 from its distribution to LP. LP noted that the Company distributed more than $1,300,000 of LP's funds to other unit holders, including to Goradia, the owner of AFWest, who had a controlling interest in the Company. LP brought a breach-of-contract claim against the Company, alleging that the Company breached the Agreement by failing to make distributions in accordance with its terms.[3] LP alleged that, after deducting the $45,251.00 that LP received in the 2011 Distribution, it suffered damages of $1,919,241.30.

The Company answered, generally denying LP's allegations and asserting various specific denials and affirmative defenses. The Company also brought a counterclaim against LP, seeking a declaration that its distributions to LP were in accordance with the terms of the Agreement and seeking a declaration of its rights under the Agreement.

---

[3] LP also brought a claim against AFWest for breach of contract; brought claims against AFWest and Goradia for breach of fiduciary duty and unjust enrichment; and brought claims against AFWest, Goradia, and the Company for breach of the implied covenant of good faith and fair dealing. These claims are the subject of LP's conditional cross-appeal, which we do not reach.

LP filed a summary-judgment motion, asserting that it was entitled to judgment as a matter of law on its breach-of-contract claim against the Company because the summary-judgment evidence established that the Company, in 2011, after a recapitalization transaction governed by the clear and unambiguous terms of section 6.02 of the Agreement, made a distribution to its members. However, the Company breached the Agreement by improperly withholding $1,964,492.30 from its distribution to LP. LP attached to its summary-judgment motion a copy of the Agreement; materials regarding procedures employed by the United States Department of the Treasury, Internal Revenue Service; certain financial records; discovery responses; numerous emails; and excerpts of the depositions of Goradia; David Wascom, a Certified Public Accountant; Richard Furlin, vice president of Goradia Capital and a member, Secretary, and Tax Matter Member of the Company; and the Company's expert witness, Bruce McGovern, a member of the faculty of South Texas College of Law.

In its summary-judgment response, the Company argued that material fact issues precluded summary judgment on LP's breach-of-contract claim because the evidence established that the Company had complied with the unambiguous terms of the Agreement. The Company asserted that, based on its interpretation of the Agreement, specifically, section 6.01(a)(iii)(B), it properly withheld a $1.00 per unit strike price from the 2011 Distributions to its members, including LP.

The Company asserted that, between January 2010 and June 2011, the Company made certain "Tax Distributions," pursuant to section 6.01(d) of the Agreement, to LP in the amount of $1,603,198. And, in September 2011, it made an additional tax distribution to LP in the amount of $313,327. However, the Company did not deduct the strike price because it did not want LP to have to pay its tax liability with other funds. The Company instead chose to "offset the amounts due from [LP] from the next distribution that was not associated with [LP's] tax liability." Thus, in its 2011 Distribution, which constituted a "non-tax distribution," to LP, it deducted the strike price. The Company attached to its summary-judgment response a copy of the Agreement; several emails; the affidavit of Furlin; and excerpts of the depositions of Furlin, Goradia, Wascom and Stephen Lyttleton. Furlin, in his affidavit, explained:

> The Company allocated taxable income or losses to [LP] related to its Class 3 units and it received cash distributions from the Company pursuant to section 6.01(d) of the [Agreement] to cover the tax liability it incurred when the Company generated taxable income. From January 2010 to June 2011, [LP] received $1,603,198.00 in section 6.01(d) distributions related to the Class 3 units. In September 2011, separate from the distribution in which the strike price was withheld, [LP] received an additional $313,327.00 in section 6.01 distributions. Beyond that date, the Company paid out millions more in section 6.01(d) distributions to [LP]. The Company made these distributions to [LP] to enable it to pay tax liabilities associated with the taxable income allocated to [LP's] Class 3 ownership units. Without the distributions, [LP] would have to use other sources to satisfy its tax liability on the taxable income that had yet to be distributed. In lieu of reducing the section 6.01(d) distributions by the dollar amount of the outstanding Strike Price, the Company chose to offset the amounts due

10

from [LP] from the next distribution that was not associated with [LP's] tax liability.

. . . .

. . . Based on the Board's Interpretation of the LLC Agreement and its sections 6.01(a)(iii)(B) and 11.01 the Company withheld a $1.00 strike price from the September 2011 distributions to Class 3 members, including [LP] . . . . When the refinancing occurred, the Company had not recovered the Strike Price owed by [LP] on the Class 3 units, despite [LP's] receipt of section 6.01(d) distributions. To recover the amount owed, the Company deducted the Strike Price from the September 2011 distribution. The Company initially escrowed the withheld funds, but eventually distributed the funds to the non-Class 3 unitholders on March 14, 2013.

The trial court, without specifying its grounds, granted LP summary judgment on its breach-of-contract claim against the Company. In its final judgment, the trial court awarded LP actual damages in the amount of $1,919,241.30 and attorney's fees in the amount of $694,136.12 through trial, with conditional fees for appeal.[4]

## Summary Judgment

In its first and second issues, the Company challenges the trial court's rendition of summary judgment in favor of LP on its breach-of-contract claim.

---

[4] The trial court also granted summary judgment in favor of AFWest on LP's breach-of-contract claim against it. Further, the trial court granted summary judgment in favor of the Company, AFWest, and Goradia on LP's claims against them for breach of fiduciary duty, good faith and fair dealing, and unjust enrichment. The trial court severed the only remaining claim, that of LP's "Double-Deduction" claim against the Company, relating to its alleged double-deduction of approximately $350,000 in tax advances from distributions to LP.

11

*Standard of Review and Principles of Law*

The Agreement provides that it "shall be governed by, and construed in accordance with, the Laws of the State of Delaware applicable to contracts made and performed in [that] state, without regard to conflicts of law doctrines." We apply Texas procedural law, and we apply Delaware law on the issues of contract construction and interpretation. *See Monsanto Co. v. Boustany*, 73 S.W.3d 225, 229 (Tex. 2002); *Allis-Chambers Energy, Inc. v. GSSF Master Fund, L.P.*, No. 05-07-00584-CV, 2008 WL 2170832, at *1 (Tex. App.—Dallas May 27, 2008, no pet.) (mem. op.).

We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). In conducting our review, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Valence Operating*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215. If a trial court grants summary judgment without specifying the grounds for granting the motion, we must uphold the judgment if any of the asserted grounds are meritorious. *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 148 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

To prevail on a traditional summary-judgment motion, the movant must establish that no genuine issue of material fact exists and that it is entitled to

12

judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). When a plaintiff moves for summary judgment on its own claim, it must conclusively prove all the essential elements of its cause of action. *Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999). Once the movant produces sufficient evidence to establish its right to judgment, the burden shifts to the nonmovant to come forward with competent controverting evidence raising a fact issue. *See Van v. Pena*, 990 S.W.2d 751, 753 (Tex. 1999). A genuine issue of fact arises if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary judgment evidence. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

Under Delaware law, the elements of a breach-of-contract claim are the existence of a contract, the breach of an obligation imposed by that contract, and resulting damage to the plaintiff. *VLIW Tech., LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 612 (Del. 2003). With regard to interpreting the provisions of a limited liability company agreement, as here, ordinary contract interpretation rules apply; the court's role is to effect the parties' intent based on the plain meaning of the agreement's terms. *Zimmerman v. Crothall*, 62 A.3d 676, 690–91 (Del. Ch. 2013); *Senior Tour Players 207 Mgmt. Co. v. Golftown 207 Holding Co.*, 853 A.2d 124,

13

127 (Del. Ch. 2004); *see also Monsanto*, 73 S.W.3d at 229 ("Delaware law sets forth familiar principles for construing written agreements.").

"Delaware adheres to the 'objective' theory of contracts, i.e., a contract's construction should be that which would be understood by an objective, reasonable third party." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010). The contract is read as a whole, giving each provision and term effect, so as not to render any part of the contract mere surplusage. *Id.* "We will not read a contract to render a provision or term 'meaningless or illusory.'" *Id.* When the contract is clear and unambiguous, we will give effect to the plain meaning of the contract's terms and provisions. *Id*. at 1159–60.

To the contrary, if we "may reasonably ascribe multiple and different interpretations to a contract, we will find that the contract is ambiguous." *Id*. at 1160. An unreasonable interpretation is one that produces an absurd result or that no reasonable person would have accepted when entering the contract. *Id.* If a contract is ambiguous, we apply the doctrine of *contra proferentem* against the drafting party and interpret the contract in favor of the non-drafting party. *Id*. The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous. *Id.* The determination of ambiguity lies within the sole province of the court. *Id*.

### Breach of Contract

The parties do not dispute that the Agreement constitutes a valid contract. *See VLIW Tech.*, 840 A.2d at 612. They dispute whether the Company breached its terms. It is undisputed that LP owned 1,964,492 Class 3 Units at the time of the 2011 Distribution and that the Company deducted $1,964,492 from its 2011 Distribution to LP as a "Strike Price" deduction. The parties dispute whether the terms of the Agreement authorized the strike-price deduction.

In its summary-judgment motion, LP argued that the evidence conclusively establishes that the Company breached the Agreement by not making the 2011 Distribution to LP in accordance with the applicable provision, i.e., section 6.02(1), which governs distributions after recapitalization transactions. To its summary-judgment motion, LP attached a copy of the Agreement. Again, the Agreement defines a "Recapitalization Transaction" as "the financing or refinancing of debt secured by the assets of the Company . . . in an amount in excess of $10,000,000 in the aggregate and followed by the distribution of all or a significant portion of such amounts to the Members existing as of such date. It is undisputed that the Company, in the summer of 2011, obtained $300,000,000 to refinance existing debt. This was followed, in August 2011, by the Company's distribution of half of those funds, or $150,000,000, to the members. LP's summary-judgment evidence shows that the Company, in its responses to LP's Requests for Admission, admitted that the 2011

Distribution was "made upon a Recapitalization Transaction under [section] 6.02(1) of the Agreement." Section 6.02(1) of the Agreement provides, in pertinent part, as follows:

> (1)    . . . [U]pon a Recapitalization Transaction, after adjusting the Capital Accounts for all distributions made under <u>Section 6.01</u> and all allocations under this <u>Article 6</u>, all available proceeds distributable to the Members shall be distributed to the Members as follows:
>
> . . . .
>
> (d)    . . . [T]o the Holders of . . . Class 3 Common Units . . . pro rata in proportion to the number of such Units.

In determining the parties' shared intent, we look "to the most objective indicia of that intent: the words found in the written instrument." *Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC*, No. C.A. 3158-VCL, 2009 WL 1111179, at *8 (Del. Ch. Apr. 27, 2009). Nothing in section 6.02(1) expressly provides for a strike-price deduction. Section 6.02 does, however, provide that distributions shall be made "after adjusting the Capital Accounts[5] for all distributions made under Section 6.01."[6]

---

[5]    The Agreement defines a "Capital Account" as "the account to be maintained by the Company for each Member."

[6]    Section 6.02(1) also provides that distributions shall be made after adjusting the Capital Accounts for "all allocations" under article 6. Allocations under Article 6 are specifically addressed at sections 6.05 (allocating among the members each item of "Profit and Loss of the Company"), 6.06 ("Regulatory Allocations"), 6.07 ("Curative Allocations"), and 6.08 ("Income Tax Allocations"). Neither party asserts that any of these provisions apply or are at issue in this appeal.

Section 6.01 specifically provides for the distribution of "Available Funds,"
i.e., funds on hand after the payment of obligations and the establishment of reserves,
as follows:

(a) Subject to Section 4.02(d)(ii) [applicable to holders of Class 1 Preferred Units] and after giving effect to Section 6.01(b), to the extent the Board determines that (i) the Company has funds on hand available for distribution to the Members (after payment of then-due obligations of the Company and the establishment of reasonable reserves for the Company's liabilities, obligations, working capital and other anticipated needs, including any distribution required under Section 6.01(c)) (hereinafter "Available Funds") and (ii) it is appropriate to make any such distribution of Available Funds, then *the Board shall* (subject to any contractual or legal restraints that may be applicable to the Company, such as restraints under the Loan and Security Agreement and any other applicable debt covenants) *declare and make distributions of Available Funds as follows*:

(i) First, to the Holders of Class 4 Common Units…

(ii) Next, to the Holders of Class 1 Preferred Units…

(iii) *Thereafter, to Holders of* Class 2 Common Units, *Class 3 Common Units* and Class 4 Common Units *pro rata in proportion to the number of such Units; provided, however:*

. . . .

(B) *Any distribution payable in respect of a Class 3 Common Unit pursuant to this Section 6.01 shall not be distributed in respect of such Class 3 Common Unit (but instead shall be distributed among the other Holders pursuant to the applicable provision of Section 6.01) until the cumulative amount of distributions foregone in respect of such Class 3 Common Unit pursuant to this Section 6.01(a)(iii) is equal to the Strike Price of such Class 3 Common Unit.*

17

(b)    Notwithstanding the provisions of <u>Section 6.01</u>, any Available Funds attributable to the receipt of DSM Amounts shall be distributed to the Holders of Class 2 Common Units pro rata in proportion to the number of Class 2 Common Units held.

(c)    Notwithstanding the provisions of <u>Sections 6.01(a)(iii)</u>, <u>6.01(b)</u> and <u>6.02</u>, if at the time of any distribution under <u>Sections 6.01(a)(iii)</u>, <u>6.01(b)</u> and <u>6.02</u>, the Unreturned Class 5 Capital or the Unpaid Class 5 Return is greater than zero, then any amounts otherwise distributable to Holders of Class 2 Common Units or Class 3 Common Units pursuant to <u>Section 6.01(a)(iii)</u>, <u>6.01(b)</u> or <u>6.02</u> shall instead be distributed to Holders of Class 5 Common Units until (i) the Unreturned Class 5 Capital has been reduced to zero and then (ii) the Unpaid Class 5 Return has been reduced to zero.

(Italicized emphasis added.)

Considering the plain meaning of its terms, section 6.01(a) states that, when the Company determines, based on the specific formula therein, that it has "Available Funds" and that it is "appropriate to make any such distribution of Available Funds," then the Board "shall," subject to certain exceptions, "declare and make distributions of Available Funds." This language is qualified, however, in that the Board shall "declare and make distributions of Available Funds *as follows*: . . . to Holders of . . . Class 3 Common Units . . . pro rata in proportion to the number of such [u]nits; *provided, however*, . . . [that] [a]ny distribution payable in respect of a Class 3 Common Unit pursuant to this <u>Section 6.01</u> shall not be distributed in respect of such Class 3 Common Unit (but instead shall be distributed among the other Holders pursuant to the applicable provision of <u>Section 6.01</u>) *until the cumulative*

18

*amount of distributions* foregone in respect of such Class 3 Common Unit *pursuant to this Section 6.01(a)(iii)* is equal to the Strike Price of such Class 3 Common Unit." (Emphasis added.)

Again, "Delaware adheres to the 'objective' theory of contracts, i.e., a contract's construction should be that which would be understood by an objective, reasonable third party." *Osborn*, 991 A.2d at 1159. The words "provided, however" above, like the words "provided that," "normally create a condition." *Sage Software, Inc. v. CA, Inc.*, No. C.A. 4912-VCS, 2010 WL 5121961, at *8 (Del. Ch. Dec. 14, 2010), *aff'd*, 27 A.3d 552 (Del. 2011). Section 6.01(a) conditions, or qualifies, the distribution of Available Funds to a holder of a Class 3 Common Unit upon the cumulative amount of distributions foregone with respect to that unit being equal to its strike price. Thus, distributions of Available Funds are subject to a strike-price deduction. LP's summary-judgment evidence shows, and the parties do not dispute, however, that the Company has never made a section 6.01(a) distribution of Available Funds to LP.

Section 6.01(d) provides for specific "Tax Distributions," i.e., distributions "sufficient to satisfy the Members' projected estimated income tax liability," as follows:

> (d)  On each Tax Distribution Date, the Company shall, to the extent the Board determines such amounts to be available for distribution, make distributions to the Members in such amounts as the Board determines are sufficient to satisfy the Members'

19

projected estimated income tax liability with respect to the Company's income allocable to their Units for such period, including an reallocation of amounts of income to a Member which may occur due to the allocations provided in Section 6.05(a). Such tax liability will be calculated as though each Member were an individual residing in the State of New York based upon the highest marginal income tax rates, taking into account U.S. federal, state, and local income taxes . . . , which the Board estimates are applicable, utilizing the respective rates for ordinary income or capital gains, depending on the characterization of the Company's estimated income for such period. Any distribution made to a member pursuant to this Section 6.01(d) shall be treated as an advanced distribution of, and shall reduce, the amounts next distributable to such Member pursuant to Section 6.01 or 6.02.

Considering the plain meaning of the terms used in section 6.01(d), the parties intent was for "Tax Distributions," i.e., distributions for "projected estimated income tax liability" to be made, pursuant to the specific formula therein, on "each Tax Distribution Date," which the Agreement defines as "the date on which estimated federal tax payments are required to be made by calendar year individual taxpayers." Section 6.01(d) further provides that if the Company makes a tax distribution, it may then reduce the next distribution that it makes under either section 6.01 or 6.02. Notably, the term "strike price" does not appear in section 6.01(d) and nothing in section 6.01(d) states that a tax distribution is subject to the strike-price deduction in section 6.01(a) or makes recoupment of any tax distribution under a subsequent section 6.02 distribution subject to a strike-price deduction.

Thus, nothing in any of the *applicable* portions of section 6.01 authorize a strike-price deduction. It is undisputed, however, that the Company deducted $1,964,492 from its 2011 Distribution to LP as a strike-price deduction. Further, the Company, in its responses to LP's Requests for Admission, admitted that a "$1.00-per-share strike price was withheld from [LP's] share" of the 2011 Distribution.

We conclude that the summary-judgment evidence establishes that the Company breached the Agreement by not making the 2011 Distribution to LP in accordance with the applicable terms. Thus, the Company had the burden to come forward with controverting evidence raising a fact issue as to its breach of the Agreement. *See Van*, 990 S.W.2d at 753.

The Company, in its summary-judgment response, argued that it was entitled to withhold the strike price from the 2011 Distribution because it had previously made tax distributions to LP under section 6.01(d), which were subject to the strike-price provision in section 6.01(a)(iii) and for which the Company did not previously withhold the strike-price.

The Company argued that a tax distribution under section 6.01(d) is subject to a strike-price deduction because section 6.01(a)(iii) provides that

> *Any distribution payable* in respect of a Class 3 Common Unit *pursuant to this Section 6.01* shall not be distributed in respect of such Class 3 Common Unit (but instead shall be distributed among the other Holders pursuant to the applicable provision of Section 6.01) until the cumulative amount of distributions foregone in respect of such Class 3

21

Common Unit pursuant to this Section 6.01(a)(iii) is equal to the Strike Price of such Class 3 Common Unit.

The Company asserts that "section 6.01(d) distributions plainly are 'pursuant to this Section 6.01.'"

The Company's argument attempts to construe subsection (a)(iii) apart from its context. Subsection (a)(iii), when read in context, reveals that it is a condition or qualification placed on distributions of Available Funds:

(a) . . . [T]o the extent the Board determines that [it has Available Funds and it is appropriate to make a distribution] . . . then the Board *shall . . . declare and make distributions of Available Funds as follows*:

. . . .

(iii) Thereafter, *to Holders of* Class 2 Common Units, *Class 3 Common Units* and Class 4 Common Units *pro rata in proportion to the number of such Units;* ***provided, however:***

. . . .

(B) *Any distribution payable in respect of a Class 3 Common Unit pursuant to this* Section 6.01 *shall not be distributed in respect of such Class 3 Common Unit (but instead shall be distributed among the other Holders pursuant to the applicable provision of* Section 6.01*) until the cumulative amount of distributions foregone in respect of such Class 3 Common Unit pursuant to this* Section 6.01(a)(iii) *is equal to the* **Strike Price** *of such Class 3 Common Unit.*

(Emphasis added.)

In *Sage Software*, the plaintiff argued, as the Company similarly argues in the instant case, that a clause following a semi-colon and the phrase "provided that" created an independent clause that modified the entire agreement. 2010 WL 5121961, at *6–7. Conversely, the defendant argued that the phrase "provided that" created a condition that modified only the immediately preceding language. *Id.* The court noted that the words "provided that" normally create a condition, and it declined to apply the clause outside of the subsection in which it was embedded. *Id.* at *7. The court held that, as a condition, the clause necessarily "modified the preceding text." *Id.* at *8. Similarly, here, as discussed above, subsection 6.01(a)(iii) modifies the preceding language in section 6.01(a).

Further, the Company's argument attempts to engraft the strike-price provision in subsection (a)(iii) into subsection (d) in order to authorize a strike-price deduction from a tax distribution. As discussed above, the stated intent of section 6.01(d) is for the Company to provide its members with "Tax Distributions," i.e., distributions "sufficient to satisfy the Members' projected estimated income tax liability" with respect to the Company's income, to allow the members to pay their tax liability on the date on which estimated federal tax payments are required to be made. Engrafting a strike-price deduction into a Tax Distribution, as the Company argues, would render the stated purpose of section 6.01(d) meaningless and illusory in that LP would not actually receive a distribution "sufficient to satisfy [its]

23

projected estimated income tax liability." "We will not read a contract to render a provision or term 'meaningless or illusory.'" *Osborn*, 991 A.2d at 1159.

Next, the Company argues that the Agreement's "General Provisions," at section 11.01, "Offset," authorize deductions as follows: "Whenever the Company is to pay any sum to any Member, any amounts that such Member, in its capacity as a Member, owes the Company may be deducted from that sum before payment." As discussed above, however, LP's summary-judgment evidence shows, and the parties do not dispute, that the Company has never made a section 6.01(a) distribution of Available Funds to LP. Further, nothing in section 6.01(d) authorizes a strike-price deduction. Moreover, "[s]pecific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one." *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005).

We note that the Company, although it asserts that the terms of the Agreement at issue are not ambiguous, largely relies on affidavit, email, and deposition excerpts to support its interpretation of the Agreement. Under Delaware law, when, as here, a contract is not ambiguous, extrinsic evidence may not be used to interpret the parties' intent. *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

We conclude that the Company did not meet its burden to bring forth evidence raising a genuine issue of material fact precluding summary judgment on LP's breach-of-contract claim. *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995); *Mayes*, 236 S.W.3d at 755 (holding that evidence raises genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all summary-judgment evidence).

We hold that the trial court did not err in granting LP summary judgment against the Company on LP's breach-of-contract claim.

We overrule the Company's first and second issues.

**Damages**

In its third issue, the Company asserts that, "[e]ven if it breached the Agreement by deducting the Strike Price from its September 2011 distribution," its breach "resulted in a very limited loss—namely, interest on the amount of the Strike Price for a relatively short period of time until recovery of the Strike Price was made in future section 6.01(d) distributions," and thus LP's "only valid complaint is that the Company prematurely withheld the Strike Price." The Company argues that the trial court erred in determining the "measure of damages" because the "measure of damages for [an] improper acceleration of the Strike Price . . . is not forfeiture, but only the lost time value of the money."

25

As a threshold matter, LP argues that the Company has waived this issue because it did not raise it until its motion for reconsideration filed after the trial court ruled on LP's summary-judgment motion.

Applying Texas procedural law, when a motion for reconsideration is filed after a summary-judgment motion is heard and ruled upon, the trial court may ordinarily consider only the record as it existed before hearing the motion the first time. *See Auten v. DJ Clark, Inc.*, 209 S.W.3d 695, 702 (Tex. App.—Houston [14th Dist.] 2006, no pet.); *Chapman v. Mitsui Eng'g & Shipbuilding Co.*, 781 S.W.2d 312, 315 (Tex. App.—Houston [1st Dist.] 1989, writ denied). The trial court may, however, consider evidence submitted with a motion for reconsideration if it affirmatively indicates in the record that it accepted or considered the evidence. *Auten*, 209 S.W.3d at 702; *see also* TEX. R. CIV. P. 166a(c) (summary-judgment evidence must be timely filed, "except on leave of court").

Here, the trial court affirmatively indicated in its order denying the Company's motion for reconsideration that it considered the motion, responses, and replies. It also issued an order striking all of the Company's evidence attached to its motion for reconsideration and supplements, except for an affidavit of Richard Furlin. Because the trial court's orders establish that the trial court affirmatively considered the arguments and evidence, we hold that the Company did not waive this issue. *See Auten*, 209 S.W.3d at 702.

26

Under Delaware law, the proper measure of damages in a breach-of-contract claim is an amount sufficient to restore the injured party to "the same place as he would have been if the contract had been performed." *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009). The proponent must prove its damages by a preponderance of the evidence, and, while absolute precision is not required, mere speculation is not sufficient. *Ivize of Milwaukee, LLC*, 2009 WL 1111179, at *10. Delaware law requires that damages be based on the reasonable expectations of the parties ex ante. *Id.* Thus, here, the question presented is what LP could have reasonably expected to receive pursuant to the terms of the Agreement at the time it was entered. *See id.*

> Furlin, in his affidavit, testified:
>
> Beginning in September 2011, [the Company] allocated tax distributions to [LP] pursuant to § 6.01(d) of the [Agreement] on the following dates and amounts: September 15, 2011, $313,327; January 12, 2012, $405,841; April 12, 2012, $783,241; June 14, 2012, $781,581; September 13, 2012, $561,078; and January 11, 2013, $137,553.

The Company, in its motion for reconsideration, asserted that because, "[s]ubsequent to the September 2011 distribution," the Company made the tax distributions to LP that Furlin described,

> by no later than June 14, 2012, an amount equal to the strike price of $1,964,492 had been distributed to [LP] in the form of tax distributions. Thus, the only possible injury to [LP] is the loss of interest on the too-early-withheld strike price in September 2011, which the Company estimates to be less than $50,000.

27

(Emphasis added.)

The Company seems to argue that because, *subsequent to* its deduction of $1,964,492.30 from the 2011 Distribution to LP at issue in this appeal, it made tax distributions to LP that eventually, by June 2012, totaled more than that amount, LP is not damaged beyond a loss of interest that may have accrued between the date of the 2011 Distribution and June 2012.

LP's reasonable expectation at the time that the Agreement was entered into was that the Company would make distributions in accordance with the applicable provisions of the Agreement. We held above that LP suffered damages when the Company deducted $1,964,492.30 as a strike-price deduction from the September 2011 Distribution made to LP. The Company provides no authority to support its argument that *subsequent tax advances*, to which LP is otherwise entitled under section 6.01(d), as discussed above, and which the Company may, pursuant to the terms of 6.01(d), later recoup, restores LP to the same place it would have been if the 2011 Distribution had been paid in accordance with the Agreement. *See Paul*, 974 A.2d at 146.

Further, the Company, in its motion for reconsideration, states that its argument "assumes that it should not have deducted the strike price from any 6.02 distributions, *but should have deducted the strike price from subsequent tax*

28

*distributions*." (Emphasis added.) We held above, however, that the Agreement does not provide for deducting the strike price from section 6.01(d) tax distributions.

The Company asserts that "[a]warding the entire amount of the Strike Price withheld constitutes an improper forfeiture." It asserts that "[a]ssuming that the Company breached the [Agreement] by deducting from the wrong category of distribution," the "only loss incurred by [LP] is the loss of the Strike Price for about nine months (i.e., from September 2011 to June 2012)." Again, this argument rests on the Company's assumption that it made a distribution that entitled it to a strike-price deduction. As discussed above, it has not. The evidence shows, and the parties do not dispute, that the Company has never made a section 6.01(a) distribution of Available Funds to LP.

We overrule the Company's third issue.

## Attorney's Fees

In its fourth, fifth, and sixth issues, the Company argues that the trial court erred in awarding LP attorney's fees on the Company's declaratory counterclaim because there is no legal basis for awarding such fees, the reasonableness, necessity, and segregability of the fees was a question of fact for a jury, and the evidence is insufficient to support the amount of the fees awarded.

## A. Availability of Attorney's Fees

In its fourth issue, the Company argues that the trial court erred in granting LP attorney's fees on the Company's counterclaim because Delaware law, and not Texas law, "should apply to whether attorney's fees are available."

In the trial court, the Company brought a counterclaim against LP pursuant to the Texas version of the UDJA ("Texas DJA"), seeking a declaration of the Company's rights under the Agreement and that it had properly withheld the strike price from its distributions to LP. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.004(a), 37.009. As part of its claim, the Company requested its attorney's fees. *See id*. § 37.009.

LP, in its summary-judgment motion and motion for entry of judgment, moved for attorney's fees based on the Company's counterclaim under the Texas DJA.[7] The trial court denied the Company's declaratory counterclaim and, in its final judgment, awarded LP attorney's fees of $694,136.12 through trial, $50,000 if the Company appealed and that appeal were unsuccessful, $20,000 if the Company filed a petition for review and review was not granted, and $30,000 if the Texas

---

[7] LP also moved for attorney's fees under Delaware law, based on its allegation against the Company of having engaged in bad-faith litigation conduct. Although the trial court, in its judgment, did not state the basis of its award of attorney's fees to LP, there are no findings in the record on LP's claim of bad-faith conduct and nothing in the record suggests that the trial court considered this claim.

Supreme Court requested briefing on the merits and LP ultimately prevailed in that Court.

Under the invited error doctrine, a party cannot complain on appeal of an error that it induced. *In re Dep't of Family and Protective Servs.*, 273 S.W.3d 637, 646 (Tex. 2009); *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 861 (Tex. 2005) (holding that litigants are precluded from requesting that trial court rule on issue and then complaining on appeal that trial court erred by making ruling); *Sentinel Integrity Solutions, Inc. v. Mistras Grp., Inc.*, 414 S.W.3d 911, 919–20 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (party cannot complain on appeal about action by trial court that party requested); *see also Gresham v. Harcourt*, 93 Tex. 149, 53 S.W. 1019, 1021 (1899) ("The principle is that if, during the progress of a cause, any party thereto request or move the court to make an erroneous ruling, and the court rule in accordance with such request or motion, he cannot take advantage of the error upon appeal." (internal quotations omitted)). Nor may a party ask something of a trial court and then complain that the court erred in granting the relief sought. *Bluestar Energy, Inc. v. Murphy*, 205 S.W.3d 96, 101 (Tex. App.—Eastland 2006, pet. denied). Similarly, a party may not argue a theory on appeal that is different from the one it presented to the trial court. *Austin Transp. Study Policy Advisory Comm. v. Sierra Club*, 843 S.W.2d 683, 689–90 (Tex. App.—Austin 1992, writ denied); *see Furnace v. Furnace*, 783 S.W.2d 682, 684 (Tex. App.—Houston [14th Dist.] 1989,

writ dism'd w.o.j.) (holding that party who argued at trial that trust agreement was ambiguous and should go to jury for interpretation could not on appeal assert that trust agreement was unambiguous and should be interpreted as matter of law). "Simply put, a party may not lead a trial court into error and then complain about it on appeal." *Keith v. Keith*, 221 S.W.3d 156, 163 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

Here, the record shows that the Company, in its counterclaim and motion for summary judgment, presented to the trial court a claim under the Texas DJA, pursuant to which it sought relief and requested attorney's fees and on which it requested a ruling. As requested, the trial court ruled on the motion. We hold that the Company invited the error, if any, in the trial court's award of attorney's fees under the Texas DJA. *See Dep't of Family and Protective Servs.*, 273 S.W.3d at 646; *Tittizer*, 171 S.W.3d at 862. Further, the Company asserts a theory on appeal that is inconsistent with the one it presented to the trial court on the same issue, namely, as to the availability of relief under the Texas DJA. *See Sierra Club*, 843 S.W.2d at 689–90. Thus, the Company is estopped from asserting its argument that Delaware law, and not the Texas DJA, governs the attorney's fees issue. *Cf. El Paso Elec. Co. v. Tex. Dep't of Ins.*, 937 S.W.2d 432, 440 (Tex. 1996).

Next, the Company asserts that, "[e]ven if this Court concludes that Texas law applies to determine the availability of fees, [LP] is still not entitled to fees" because

32

"[n]o Texas statute provide[s] for attorney's fee[s] in this case." The Company asserts that the Texas DJA (hereafter, "DJA") does not authorize the trial court's award of attorney's fees to LP on the Company's counterclaim because the Company "merely tacked on" its counterclaim for declaratory relief to LP's breach-of-contract claim. The Company asserts that Texas Civil Practice and Remedies Code chapter 38, which governs attorney's fees in breach-of-contract actions, does not authorize the recovery of attorney's fees in a breach-of-contract action against an LLC. *See Alta Mesa Holdings, L.P. v. Ives*, 488 S.W.3d 438, 455 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Thus, "[w]hen a claim for declaratory relief is merely tacked onto a standard suit based on a matured breach of contract," allowing fees under the DJA is disallowed because it would frustrate the limits that Chapter 38 imposes on such fee recoveries. *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 670 (Tex. 2009).

In *U.S. Fidelity & Guaranty Co. v. Coastal Refining* [and] *Marketing, Inc.*, the court considered similar argument. There, USF&G argued that, because Coastal was not entitled to recover attorney's fees under Chapter 38 on its breach-of-contract claim, Coastal could not recover fees under Chapter 37, the DJA, because "a party cannot use the [DJA] as a vehicle to obtain otherwise impermissible attorney's fees." 369 S.W.3d 559, 571 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The court noted that "[i]t is true that 'when a claim for declaratory relief is merely tacked onto

33

a standard suit based on a matured breach of contract, allowing fees under Chapter 37 would frustrate the limits Chapter 38 imposes on such fee recoveries.'" *Id.* (quoting *MBM Fin. Corp.*, 292 S.W.3d at 670). Thus, a party cannot convert a claim for which attorney's fees are not recoverable into a claim for which a fee award is available simply by restyling the claim as a request for declaratory judgment. *Id.* In *U.S. Fidelity*, however, the court emphasized that "it was USF&G who filed this suit for declaratory judgment, and attorney's fees can be recovered by a party in a declaratory-judgment action even if that party asserts no other claim." *Id.* The court concluded that because Coastal was eligible for an attorney's-fee award in connection with USF&G's suit for declaratory judgment, whether Coastal would have been entitled to the same award in connection with its own breach-of-contract claim was of no moment. *Id.* at 571–72.

Here, because LP was eligible for an attorney's-fee award in connection with the Company's suit for declaratory judgment, that LP was not otherwise entitled to the same award in connection with its own breach-of-contract claim is likewise of no moment. *See id.* We hold that an award of attorney's fees to LP on the Company's counterclaim was authorized under the DJA. *See MBM Fin. Corp.*, 292 S.W.3d at 669 (holding that DJA "allows fee awards to either party in all cases").

We overrule the Company's fourth issue.

34

**B.** **Jury Trial on Reasonableness, Necessity, and Segregability**

In its fifth issue, the Company argues that, even if attorney's fees were recoverable, the trial court erred in denying the Company a jury trial on the reasonableness, necessity, and segregability of those fees. It asserts that the trial court did not resolve these issues by summary judgment or submit them to a jury.

We review a trial court's attorney's fees award under the DJA for an abuse of discretion. *Hot–Hed, Inc. v. Safehouse Habitats (Scot.), Ltd.*, 333 S.W.3d 719, 733 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable as to constitute a clear and prejudicial error of law. *Id.*

The DJA "entrusts attorney fee awards to the trial court's sound discretion, subject to the requirements that any fees awarded be reasonable and necessary, which are matters of fact, and to the additional requirements that fees be equitable and just, which are matters of law." *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998); *Indian Beach Prop. Owners' Ass'n v. Linden*, 222 S.W.3d 682, 706 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2017) ("In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just."). Because the grant or denial of attorney's fees is within the sound discretion of the trial court, its judgment will not be disturbed on appeal in the absence of a clear

showing that it abused its discretion. *Oake v. Collin Cty*., 692 S.W.2d 454, 455 (Tex. 1985); *Indian Beach Prop*., 222 S.W.3d at 706. A trial court does not abuse its discretion if some evidence reasonably supports its decision. *Butnaru v. Ford Motor Co*., 84 S.W.3d 198, 211 (Tex. 2002); *Indian Beach Prop*., 222 S.W.3d at 706. A trial court abuses its discretion when it acts arbitrarily or unreasonably and without reference to any guiding rules or principles. *Bocquet*, 972 S.W.2d at 21; *Indian Beach*, 222 S.W.3d at 706. "Unreasonable fees cannot be awarded [under the DJA], even if the [trial] court believed them just, but the court may conclude that it is not equitable or just to award even reasonable and necessary fees." *Bocquet*, 972 S.W.2d at 21. A party need not prevail to be awarded attorney's fees under the DJA. *City of Pasadena v. Gennedy*, 125 S.W.3d 687, 701 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). The DJA "allows fee awards to either party in all cases." *MBM Fin. Corp.*, 292 S.W.3d at 669.

Here, because the trial court did not state the basis for its grant of attorney's fees, we may uphold its ruling on any basis supported by the evidence. *Beard v. Endeavor Nat. Gas, L.P*., No. 01-08-00180-CV, 2008 WL 5392026, at *8 (Tex. App.—Houston [1st Dist.] Dec. 19, 2008, pet. denied) (mem. op.).

*Reasonableness and Necessity*

Generally, in cases in which a jury is the factfinder, the reasonableness of attorney's fees is a question of fact for the jury's determination, and matters of equity

36

are addressed to the trial court's discretion. *Bocquet*, 972 S.W.2d at 21. For summary-judgment purposes, however, when a movant includes a prayer for attorney's fees in its summary-judgment motion, an attached affidavit may be considered as proof of the attorney's fees incurred. *Petrello v. Prucka*, 415 S.W.3d 420, 431 (Tex. App.—Houston [1st Dist.] 2013, no pet.). Generally, summary judgment is proper if the affidavit filed by the movant's attorney "sets forth his qualifications, his opinion regarding reasonable attorney's fees, and the basis for his opinion." *Basin Credit Consultants, Inc. v. Obregon*, 2 S.W.3d 372, 373 (Tex. App.—San Antonio 1999, pet. denied).

To create a fact issue, the nonmovant must, no later than thirty days after it "receives a copy of the affidavit," file a counter-affidavit contesting the reasonableness of the attorney's fees claim of the movant. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 18.001(b), (e) (West 2017). Unless a controverting affidavit is timely served, "an affidavit that the amount a person charged for a service was reasonable at the time and place that the service was provided and that the service was necessary is sufficient evidence to support a finding of fact by judge or jury that the amount charged was reasonable or that the service was necessary." *Id.* § 18.001(b); *see Petrello*, 415 S.W.3d at 431 (holding that, unless controverting affidavit filed, attorney's fees stated in affidavit presumed reasonable and necessary).

Here, the record shows that, on March 30, 2016, the trial court granted LP's summary-judgment motion on its breach-of-contract claim, which included a request for attorney's fees, and denied the Company's summary-judgment motion on its declaratory claim. Subsequently, in its "Motion for Entry of Judgment," as amended, LP requested attorney's fees under the DJA based on its having defeated the Company's declaratory-judgment action. LP asserted that it incurred $584,954.86 in attorney's fees during trial.

In support of its request for attorney's fees, LP presented the invoices of its attorneys, detailing the work performed. LP also presented the affidavit of its attorney, M. Carter Crow, a partner in the law firm of Norton Rose Fulbright (US) LLP, who set forth his experience and testified in extensive detail regarding the facts supporting the reasonableness and necessity of the attorney's fees billed by his firm and incurred by LP. *See Arthur Andersen & Co. v. Perry Equip. Corp*., 945 S.W.2d 812, 818 (Tex. 1997). Crow further opined that LP would incur an additional $50,000 in attorney's fees in the event of an appeal to the court of appeals, $20,000 in the event of an unsuccessful petition for review by the Company to the Texas Supreme Court, and $30,000 if briefing on the merits is requested and the Company does not ultimately prevail.

The Company did not file a controverting affidavit, challenging LP's asserted attorney's fees as unreasonable or unnecessary. *See* TEX. CIV. PRAC. & REM. CODE

38

ANN. § 18.001(b); *Petrello*, 415 S.W.3d at 431 (holding that, unless controverting affidavit filed, attorney's fees stated in affidavit presumed reasonable and necessary); *see also Merch. Ctr., Inc. v. WNS, Inc*., 85 S.W.3d 389, 397 (Tex. App.—Texarkana 2002, no pet.) (although reasonableness of attorney's fees under DJA normally presents fact question, clear, direct, and uncontroverted evidence of fees taken as true as matter of law where such evidence not rebutted). When, as here, no controverting affidavit is filed, mere criticism of the amount of attorney's fees sought does not create a fact issue, and the trial court may grant summary judgment on the amount of attorney's fees. *See Petrello*, 415 S.W.3d at 431–32; *see also Hunsucker v. Fustok*, 238 S.W.3d 421, 432 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding trial court abused its discretion in not awarding attorney's fees on uncontroverted affidavit).

The Company argues that because LP did not address the amount of attorney's fees in its summary-judgment motion or actually attach its affidavit to its summary-judgment motion, *Petrello* does not apply and a jury trial is required. 415 S.W.3d at 431. In *Petrello*, however, as here, the movants included a prayer for attorney's fees in their summary-judgment motion, which the trial court granted. *See id*. The movants then filed a "post-judgment motion" for attorney's fees under the DJA, to which they attached affidavits supporting an award. *See id.* at 426, 430–31.

*Segregation of Fees*

The Company next asserts that the trial court erred in awarding attorney's fees that were not segregated.

Because "Texas law [does] not allow[ ] for recovery of attorney's fees unless authorized by statute or contract," attorney's fees claimants "have always been required to segregate fees between claims for which they are recoverable and claims for which they are not." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310–11 (Tex. 2006). The need to segregate attorney's fees is a question of law, and the extent to which certain claims can or cannot be segregated is a mixed question of law and fact. *Id.* at 312–13; *CA Partners v. Spears*, 274 S.W.3d 51, 81 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). The party seeking to recover attorney's fees carries the burden of demonstrating that fee segregation is not required. *See Hong Kong Dev., Inc. v. Nguyen*, 229 S.W.3d 415, 455 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

"[I]f any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees." *Chapa*, 212 S.W.3d at 313. "[I]t is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Id.* at 313–14. For example, the court in *Chapa*, noted that where segregation is required, attorneys are not required to "keep separate time records

40

when they draft[ ] the fraud, contract, or DTPA paragraphs of [a] petition." *Id.* at 314. Rather, an opinion will suffice if it states, for example, that "95 percent of their drafting time would have been necessary even if there had been no fraud claim." *Id.*; *7979 Airport Garage, L.L.C. v. Dollar Rent-a-Car Sys., Inc.*, 245 S.W.3d 488, 506 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

Here, Crow, in his affidavit, states that the "fees amounts only include time spent preparing for [the] Strike Price Claim." Crow states that he "fully redacted from the attorneys' fees invoices listed [in the attached exhibits] the time spent solely to advance" LP's claims for fiduciary duty, good faith and fair dealing, and unjust enrichment, as well as LP's severed "Double-Deduction Claim." Crow testifies that he has "not included or relied on those numbers in [his] calculations." Further, the "remaining hours were reasonably and necessarily intertwined with" the strike price claim. *See Chapa*, 212 S.W.3d at 313–14.

We conclude that LP, notwithstanding whether it was so required, did segregate its attorney's fees. *See Chapa*, 212 S.W.3d 299, 310–11; *see, e.g.*, *Petro-Hunt, L.L.C. v. Wapiti Energy, L.L.C.*, No. 01-10-01030-CV, 2012 WL 761144, at *11 (Tex. App.—Houston [1st Dist.] Mar. 8, 2012, pet. denied) (mem. op.).

## C.    Sufficiency of the Evidence Supporting Amount of Fees

The Company next asserts that "[e]ven if this Court concludes that fees are legally recoverable and properly determined by the trial court, the award must be

41

vacated because the trial court arbitrarily awarded an amount that was not supported by evidence and exceeded the fees" that LP requested.

In its original motion for entry of judgment, LP requested attorney's fees in the amount of $694,136.12 through trial. In its response to the motion, the Company asserted that certain time entries constituted "non-litigation matters" that should not have been included. Prior to the trial court's entry of judgment, LP filed an amended attorney's fees affidavit, discussed above, modifying the amount of its requested attorney's fees to $584,954.86. The judgment awards the higher amount. The Company asserts that the trial court's judgment "must be vacated with respect to the excess amount of attorney's fees." LP, in its brief, agrees that the trial court's award of attorney's fees should be modified to comport with the evidence, i.e., its amended affidavit supporting an attorney's fees award in the amount of $584,954.86.

Accordingly, we sustain the Company's sixth issue and modify the trial court's judgment to award LP attorney's fees in the amount of $584,954.86.

### Cross–Appeal

In its brief, LP raises four conditional issues regarding its breach-of-contract claim against AFWest and its tort claims against the Company, AFWest, and Goradia. It asks that this Court reach these issues only if, aside from the requested reduction of attorney's fees, the Court otherwise modifies or reverses the trial court's

judgment.  Because we have otherwise overruled the Company's issues, we do not reach LP's cross-appeal.  *See* TEX. R. APP. P. 47.1.

## Conclusion

We modify the trial court's judgment in accordance with LP's request that its attorney's fees award be reduced to $584,954.86 and, as modified, affirm the judgment of the trial court.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Jennings and Lloyd.